[No. A021115. First Dist., Div. One. Mar. 25, 1985.]

UNITED STATES COLD STORAGE OF CALIFORNIA,
Plaintiff and Appellant, v.
GREAT WESTERN SAVINGS AND LOAN ASSOCIATION et al.,
Defendants and Respondents.

COUNSEL

McCutchen, Doyle, Brown & Enersen, Richard Murray, Donn P. Pickett, George Grellas and J. Bradley O'Connell for Plaintiffs and Appellants.

Miller, Starr & Regalia, Harry D. Miller, George B. Speir and Edmund L. Regalia for Defendants and Respondents.

OPINION

**HOLMDAHL, J.**—This is an appeal from a judgment of nonsuit after plaintiff's opening statement. The case concerns notice requirements for foreclosure sales.

The judgment is affirmed.

### Statement of Facts[1]

Plaintiff United States Cold Storage of California is a corporation engaged in the building and operating of refrigerated warehouses. In 1975, plaintiff sold a refrigerated warehouse to the Sapp family (hereafter, Sapps). The sale price was $3.6 million. Sapps paid $400,000 in cash and borrowed the remaining $3.2 million under the following terms. They obtained from defendant Great Western Savings & Loan Association (hereafter, Great Western) $2.25 million, secured by a first trust deed. They executed two promissory notes in favor of plaintiff, in the sums of $600,000 and $350,000, secured by second and third deeds of trust, respectively. The deeds of trust were executed as one transaction on the date of closing, December 30, 1975.

Sapps made payments to Great Western in a timely fashion throughout 1976, but soon defaulted on their notes held by plaintiff. Plaintiff at this

---

[1]The facts are taken from plaintiff's opening statement. We accept them as proved. (*Smith v. Roach* (1975) 53 Cal.App.3d 893, 897 [126 Cal.Rptr. 29].)

time did not seek to foreclose, but instead chose to assist Sapps in improving their business. Nonetheless, Sapps failed to make their May 1977, payment to Great Western. Great Western noticed a default on June 10, 1977. Plaintiff sought to assume Great Western's note and deed of trust. Great Western refused on the basis of a due-on-sale clause contained in its loan agreement with Sapps; it also insisted on the payment of late charges. Plaintiff contended that both the due-on-sale clause and the late charges were invalid.

On September 16, 1977, Great Western properly noticed a trustee's sale of the warehouse for October 21, 1977. In the meantime, however, Sapps were threatening to file bankruptcy. The petition's filing would stay a foreclosure sale. Aware of this fact, Great Western agreed to give Sapps five months to improve their finances. In turn, Sapps would file a bankruptcy petition which would stay the sale. If Sapps remained unable to redeem the property, they would then file to dismiss the petition. Thus, if Sapps remained in default at the end of the five months, Great Western would be able to pursue foreclosure without hindrance from a bankruptcy stay.

Pursuant to this agreement, Sapps transferred the warehouse property to their corporate shell, Merchants Ice and Cold Storage (hereafter Merchants), which initiated Chapter 11 bankruptcy proceedings on October 20, 1977, the day before the scheduled sale. The filing of Merchants' petition automatically stayed the sale.

On October 21, 1977, Great Western's agent appeared at the time and place appointed for the sale and declared that the sale was being postponed to November 4, 1977. The room was empty save for the agent, however. Plaintiff, and presumably other potential bidders, had learned that the petition had been filed and, knowing that the sale would be stayed, chose not to attend. Plaintiff's attorney believed that the filing of the petition would prevent any act in furtherance of foreclosure, including a postponement of the sale.

On November 4, 1977, Great Western's agent stated again in an otherwise empty room that the sale was now being postponed to December 2, 1977. In the meantime, however, on November 30, 1977, the bankruptcy court approved the agreement between Great Western and Sapps, and ordered that no sale could occur until March 20, 1978.

Nonetheless, Great Western's agent, on December 2, 1977, postponed the sale to January 4, 1978. As before, the announcement was read to an empty room. No additional notice of the sale was given.

On the same date of December 2, 1977, Merchants filed for dismissal of the bankruptcy proceedings and the bankruptcy court dismissed the case on December 16, 1977. Following this dismissal, Great Western did not give new notice of the sale. On January 4, 1978, the date the sale was to take place, defendant's agent, again in an empty room, postponed the sale, a fourth and final time, this time to March 21, 1978. This date was the first date of all the dates scheduled for a sale on which a sale was permitted. But Great Western did not give additional notice of the sale.

Plaintiff remained unaware of the postponements, but inadvertently discovered on March 3, 1978, that the sale would take place on March 21. This occurred during a telephone conversation with a Great Western official, when plaintiff again attempted to assume the loan, and Great Western again insisted on the due-on-sale clause. Plaintiff complained to Great Western about its failure to give any notice of the sale since September 16, 1977. It offered to notify bidders at its own expense if Great Western would only agree to postpone the sale. Great Western, however, refused; it justified its failure to provide notice on the ground that it was merely postponing the original date of the sale.

The sale took place on March 21, 1978. Plaintiff was present but refused to bid, primarily because it believed that the sale was illegal, and, therefore "would have no legal effect"; and also because there was some confusion as to whether the sale consisted of real property or of refrigeration equipment, or both.

Great Western was the only bidder. Its sister corporation, defendant California Reconveyance Company, Inc. (hereafter CRC), performed trustee functions at the instructions of Great Western. Its lawyer conducted the sale and accepted Great Western's bid of $1,352,044.40. The fair market value of the property was approximately $3.9 million.

Because the bid was insufficient to satisfy Great Western's own security interest, plaintiff took nothing from the sale. Plaintiff lost its entire security interest of $1,050,000. Sapps subsequently filed for bankruptcy, so that plaintiff no longer has any means to recover its interest.

On October 5, 1978, Great Western offered to sell the property to plaintiff for the amount of Great Western's investment. Plaintiff refused, and made a counteroffer to buy the property for the amount of Great Western's investment, minus the amount that its insurer would pay. Great Western did not respond.

### Procedural History

On August 4, 1978, plaintiff filed in San Francisco County Superior Court a complaint against Great Western and CRC (hereafter defendants) for damages or, alternatively, for injunctive and declaratory relief. Plaintiff alleged two causes of action: failure to conduct the sale lawfully and breach of an implied covenant of good faith and fair dealing.

On March 19, 1982, Great Western moved for summary judgment. The motion was denied, and the cause was heard by the trial court in proceedings beginning November 2, 1982. Plaintiff waived a jury trial solely because the trial court indicated it intended to grant a nonsuit. Plaintiff pursued three legal theories at trial, based upon the same factual situation: violation of the automatic bankruptcy stay, interference with prospective economic advantage, and breach of an implied covenant of good faith and fair dealing. After plaintiff's opening statement, defendants moved for an order granting judgment of nonsuit. On November 24, 1982, the trial court granted the motion. The trial court decided that defendants owed no duty to plaintiff; that defendants' postponements of the sale did not violate the automatic stay provisions; and that, as a matter of law, defendants did not interfere with plaintiff's prospective economic advantage.[2] Plaintiff's timely appeal followed.

### Applicability of Arnolds Management Corp. v. Eischen

At the outset, we discuss the applicability of a recent case which defendants, in a supplemental brief, claim to be dispositive, because under the reasoning of that case, plaintiff would fail to state a cause of action.[3]

The case in question is *Arnolds Management Corp.* v. *Eischen* (1984) 158 Cal.App.3d 575 [205 Cal.Rptr. 15]. There, an appellate court held that a junior lienor could not challenge a foreclosure sale on the basis of procedural irregularities such as improper notice, unless that lienor had first tendered the full amount due on the senior obligation.

*Arnolds* is significant because it is the first case to apply the tender requirement to a junior lienor. Prior cases only concerned the duty of a trustor or the successor of a trustor to tender.

---

[2]The trial court made no express finding or ruling as to the cause of action for and theory advanced upon breach of an implied contract of good faith and fair dealing.

[3]Defendants' argument, raised for the first time on appeal, is nevertheless properly before us. (*Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].)

Defendants argue that plaintiff, as a junior lienor, was required by *Arnolds* to make a full tender of Great Western's senior obligation. Because plaintiff's complaint fails to allege such tender, it fails to allege facts sufficient to state a cause of action. Hence, this court should affirm the judgment.

Plaintiff responds with four arguments.

First, *Arnolds* is bad law.

Second, *Arnolds* is inapplicable to the situation before us: unlike *Arnolds,* this action is based upon the breach of a covenant, arising from an automatic subordination agreement between plaintiff and Great Western; this action seeks damages, not equitable relief, and *Arnolds* is an equity case; in this action, unlike in *Arnolds,* adequate notice of the sale would not have been futile.

Third, *Arnolds* should not be given retroactive application, because it is a major departure from the law.

Fourth, plaintiff in any event satisfied the tender requirement of *Arnolds.* It offered to assume the debt owed to Great Western. It was Great Western that refused the offer.

For the reasons stated below, we find persuasive plaintiff's argument that *Arnolds* should not be applied retroactively; hence we need not debate its merits or its applicability to the facts at hand.

The California Supreme Court discussed retroactivity in *Barber* v. *State Personnel Bd.* (1976) 18 Cal.3d 395, 400 [134 Cal.Rptr. 206, 556 P.2d 306], stating in part: "Two factors of primary importance in resolving the issue of retroactivity are the extent to which the change in the law was foreshadowed and foreseeable and the extent of the reliance placed upon the former rule of law." Stated another way, we are to determine not only whether the change in law was clearly foreshadowed and relied upon, but also whether retroactive application of the rule would produce inequitable results.

First, we discuss whether the *Arnolds* rule was clearly foreshadowed.

As implied above, the law is long-established that a *trustor* or his successor must tender the obligation in full as a prerequisite to challenge of the foreclosure sale. (E.g., *Humboldt Sav. Bank* v. *McCleverty* (1911) 161 Cal. 285, 290 [119 P. 82]; *Williams* v. *Koenig* (1934) 219 Cal. 656, 660

[28 P.2d 351]; *Crummer* v. *Whitehead* (1964) 230 Cal.App.2d 264, 268 [40 Cal.Rptr. 826]; *Karlsen* v. *American Sav. & Loan Assn.* (1971) 15 Cal.App.3d 112, 117 [92 Cal.Rptr. 851]; *Munger* v. *Moore* (1970) 11 Cal.App.3d 1 [89 Cal.Rptr. 323].)

▪ We have found only one decision pertaining to the necessity of tender by others besides trustors or their successors, however. That decision is a 1911 California Supreme Court decision, *Humboldt Sav. Bank* v. *McCleverty, supra,* 161 Cal. 285. We thus cannot say that the weight of judicial authority prior to *Arnolds* foreshadowed the *Arnolds* rule.

In addition, *Humboldt* in any event did not foreshadow *Arnolds*. Although the plaintiffs in *Arnolds* had relied upon *Humboldt,* as plaintiff does here, as support for their argument that it would be inequitable to require them to pay the senior obligation, *Arnolds* distinguished *Humboldt* on the ground that it did not pertain to junior lienors.

Further, whether or not *Humboldt* is in fact distinguishable from *Arnolds, Humboldt* provides at least some support for the notion that one not liable for a debt is not required to tender as a prerequisite to an attack on a foreclosure sale. The facts in *Humboldt* were that a trustee had received the deed of trust of two parcels of property as security for a promissory note from one McCleverty. McCleverty's wife later obtained a homestead interest in one of the two parcels. Her parcel was substantially less valuable than the other. McCleverty defaulted on the note and the trustee sold both of the properties. In the meantime McCleverty died. Mrs. McCleverty then filed an action against the trustee for selling both the homestead and the other parcel. Her husband's debt would have been satisfied—but for a very small sum—from the proceeds of the sale of the other parcel alone. Had it been sold first, there would have been no need to sell the second parcel.

The trustee argued that Mrs. McCleverty could not have the sale set aside, because she failed to offer to pay the entire debt secured by the deed of trust. But the court disagreed: "It has often been held that an action to set aside a sale by trustees or on foreclosure for irregularities of any kind should ordinarily be accompanied by an offer to redeem by paying the sum due." (*Humboldt Sav. Bank* v. *McCleverty, supra,* 161 Cal. 285, 290.) Nonetheless, "[u]nder the circumstances disclosed by this record, the defendant [widow] would be subjected to very evident injustice and hardship if her right to attack the sale were made dependent upon an offer by her to pay the whole debt. *The debt was not hers, and she was not liable for any part of it.* Her only interest was in the homestead property, which, with other land, was held as security for McCleverty's note." (*Id.,* at p. 291,

italics added.) The court found that there was "no equity in the claim that, in order to attack an unauthorized sale of her five-thousand-dollar home-stead, she must pay, or offer to pay, a debt of $57,000, for which she is in no way liable." (*Ibid.*)

Having discussed the relevant judicial authority, we next analyze the statutory language relied upon by *Arnolds* to ascertain whether the decision was foreseeable.[4] We find that this language also fails to "clearly foreshadow" the new rule, however. As the *Arnolds* court itself recognizes, "Civil Code section 2904 permits a junior lienor to redeem a property from the senior lienor and to be subrogated to all benefits of the superior lien. Civil Code section 2876 permits a junior lienor to add the amount of the senior lien he has satisfied to the amount owed him. Civil Code section 2924c, subdivision (a)(1) permits a junior lienor to cure a trustor's default within three months of the recording of notice of default." (*Arnolds Management Corp.* v. *Eischen, supra,* 158 Cal.App.3d 575, 579, italics added, fns. omitted.)

This language nowhere implies that a duty by the junior lienor to tender is to be—or should be—imposed.

Finally, we look to the rationale behind the requirement of tender. ■ This requirement is founded upon equitable principles: " ' " 'Equity will not interpose its remedial power in the accomplishment of what seemingly would be nothing but an idly and expensively futile act, nor will it purposely speculate in a field where there has been no proof as to what beneficial

---

[4]The sections in question are the following:

Civil Code section 2904 states: "One who has a lien inferior to another, upon the same property, has a right: 1. To redeem the property in the same manner as its owner might, from the superior lien; and, 2. To be subrogated to all the benefits of the superior lien, when necessary for the protection of his interests, upon satisfying the claim secured thereby."

Civil Code section 2876 states: "Where the holder of a special lien is compelled to satisfy a prior lien for his own protection, he may enforce payment of the amount so paid by him, as a part of the claim for which his own lien exists."

Civil Code section 2924c, subdivision (a)(1) states in part: "Whenever all or a portion of the principal sum of any obligation secured by deed of trust or mortgage on real property hereafter executed has, prior to the maturity date fixed in such obligation, become due or been declared due by reason of default in payment of interest or of any installment of principal, or by reason of failure of trustor or mortgagor to pay, in accordance with the terms of such obligation or of such deed of trust or mortgage, taxes, assessments, premiums for insurance or advances made by beneficiary or mortgagee in accordance with the terms of such obligation or of such deed of trust or mortgage . . . any beneficiary under a subordinate deed of trust . . ., at any time within three months of the recording of the notice of default under such deed of trust or mortgage, if the power of sale therein is to be exercised, or, otherwise at any time prior to entry of the decree of foreclosure, may pay to the beneficiary or the mortgagee or their successors in interest, respectively, the entire amount then due under the terms of such deed of trust or mortgage . . . ."

purpose may be subserved through its intervention.'"'" (*Karlsen* v. *American Sav. & Loan Assn., supra,* 15 Cal.App.3d 112, 118, italics omitted.)

■ It would be futile to set aside a foreclosure sale on the technical ground that notice was improper, if the party making the challenge did not first make full tender and thereby establish his ability to purchase the property. Thus, it is sensible to require that a trustor, whose default to begin with resulted in the foreclosure, give proof before the sale is set aside that he now can redeem the property.

A junior lienor, however, is not in the same position as a trustor. He was not the one who owes the debt; he was not the one to default. Thus, he presents a lesser risk—in terms of the potential futility of setting aside a sale—than does a trustor.

Accordingly, although requiring full tender by any party seeking to challenge a sale minimizes the possibility of a wasted act by the court, the requirement of full tender by a junior lienor appears less justified—and by the same token, less *foreseeable*—under equity principles than the requirement of tender by a trustor.

We now consider whether retroactive application would produce inequitable results.

We answer in the affirmative. We conclude that it would be highly inequitable to require junior lienors to have foreseen the *Arnolds* rule, given that it is a definite departure from prior law, the advent of which was not clearly indicated. In the present case, plaintiff would have had to foresee the *Arnolds* rule six years before it came into existence.

Additionally, we believe that junior lienors are entitled to notice of this new requirement which drastically affects their rights.

Finally, we conclude that retroactive application of the *Arnolds* rule would be unjust because it has the potential of causing injury to many junior lienors who may have had the ability to tender, but did not do so under the belief that no such requirement existed. Here, for example, although plaintiff did not allege a tender of the full obligation, plaintiff attempted to assume Sapps' obligation to Great Western. Also, it appears that plaintiff had both

the intent to bid and the ability to purchase the property at the foreclosure sale.[5]

For the foregoing reasons we hold that *Arnolds* does not apply retroactively. Thus, plaintiff has stated a cause of action, notwithstanding its failure to allege tender.

*Contentions on Appeal*

We first summarize the contentions of the parties on appeal.

Plaintiff makes two arguments. ■ First, plaintiff contends that defendants had a statutory and common law duty to provide notice of the new sale date after the expiration of the stay. Plaintiff concedes that the notice of sale initially given by defendants complied with statutory requirements. Plaintiff also concedes that defendants had the statutory right to postpone the sale date without giving additional notice of the new date. ■ But plaintiff claims that the postponements made were unlawful because the sale could not lawfully occur on the postponed dates. Because the postponements were invalid, defendants were required to give additional notice after the stay expired in order to apprise potential bidders of a sale they might not have known about without following the bankruptcy proceedings.

■ Second, plaintiff contends that defendants owed a duty to plaintiff to abide by an implied covenant of good faith and fair dealing, and that defendants breached that duty. Plaintiff maintains that an implied subordination agreement existed between plaintiff and defendants. That agreement itself contained an implied covenant. The defendants breached the covenant by knowingly enforcing an illegal due-on-sale clause; "secretly" postponing the sale; later refusing to postpone the sale when asked to do so by plaintiff; and purchasing the property for a price well below its fair market value.

■ Defendants respond as follows. First, the notice statutes in question are to be strictly construed; the only duty to provide notice is that duty the statutes expressly impose. As plaintiff concedes that defendants met the express notice requirements of the statutes, defendants gave all the notice legally necessary.

[5]We note that *Arnolds* reasoned that a failure to require a junior lienor to tender "would permit plaintiffs to state a cause of action without the necessary element of damage to themselves." (*Arnolds Management Corp.* v. *Eischen, supra,* 158 Cal.App.3d 575, 580.) The situation before us, however, suggests that this proposition is not necessarily always correct. A junior lienor may suffer harm even though he failed to tender, because such failure to tender is not synonymous with an inability to redeem and the improper notice may have prevented him from attempting to redeem.

■ Additionally, defendants deny the existence either of a contractual relationship with plaintiff, whether express or implied, or of an implied covenant of good faith and fair dealing with plaintiff. In any event, they claim that even if such a covenant did exist, they did not breach it.

■ We now measure these contentions in relation to the rule that on appeal from a judgment of nonsuit on plaintiff's opening statement, the court "must accept as proved all of the facts counsel says he expects to prove and must indulge in all favorable inferences reasonably arising from those facts. [Citations.] A nonsuit is warranted only when the court can conclude from such facts and inferences that there will be no evidence of sufficient substantiality to support a judgment in favor of the plaintiff." (*Hurn* v. *Woods* (1982) 132 Cal.App.3d 896, 902 [183 Cal.Rptr. 495].)

### Requirements for Notice of Sale

■ Defendants gave notice of the foreclosure sale on September 16, 1977. Plaintiff concedes that this notice complied with relevant statutory requirements. We are asked to determine whether additional notice was required because of the postponements of the sale.

■ The general rule regarding a notice of sale is that "the only requirements of notice are those expressly prescribed by the terms of the instrument and applicable statutes." (*Lupertino* v. *Carbahal* (1973) 35 Cal.App.3d 742, 747 [111 Cal.Rptr. 112]; see also *Lancaster Security Inv. Corp.* v. *Kessler* (1958) 159 Cal.App.2d 649, 652 [324 P.2d 634], cert. den., 358 U.S. 306 [3 L.Ed.2d 347, 79 S.Ct. 345].)

■ The deed contains the following clause concerning postponement of sale dates: "Trustee *shall postpone sale* of all or any portion of the property by *public announcement* at the time and place fixed for such sale and from time to time thereafter *may postpone such sale by public announcement* on the date fixed by the preceding postponement." (Italics added.) There appears to be no express requirement of additional notice in the deed.[6]

The applicable statutes in effect during 1977-1978 provide as follows: Code of Civil Procedure section 694 provides, in part: "In case of postponements, notice of each thereof must be given by public declaration by the officer at the time and place last appointed for the sale. *No other notice of postponed sale need be given.*" (Italics added.)

---

[6]The parties mention no such requirement. The exhibit of the deed in the clerk's transcript is illegible.

Civil Code section 2924g provides: "There may be a postponement of the sale proceedings at any time prior to the completion of the sale thereof at the discretion of the trustee, or if the beneficiary instructs the trustee to postpone the sale proceedings. *The notice of each postponement shall be given by public declaration by the trustee at the time and place last appointed for sale.* Such public declaration of the postponement shall also set forth the new date, time, and place of sale, which place of sale shall be the same place as originally fixed by the trustee for the sale. *No other notice of postponement need be given."* (Italics added.)

We are aware that the Legislature amended section 2924g in 1979 to permit a maximum of three postponements only and to require additional notice of sale if such postponements are made. (Civ. Code, § 2924g, subd. (c)(1).) ■ Statutes, however, are not to be given retroactive effect unless the Legislature clearly intended such a result. (*Battle* v. *Kessler* (1983) 149 Cal.App.3d 853, 858 [197 Cal.Rptr. 170].)

The statute at issue here is silent as to retroactivity. We must deem it to be prospective in nature and, thus, inapplicable to the case, as the sale took place in 1978.

■ Judicial authority confirms that no duty to provide additional notice exists. *Cobb* v. *California Bank* (1936) 6 Cal.2d 389, 390 [57 P.2d 924] states that "where the trust deed provides that the trustee may . . . postpone [the] sale by proclamation made at the time of postponement, no further notice need be given by posting or publication." (Cited by defendants.)

Defendants publicly declared the new time and place of the sale when each postponement took place. They fulfilled all statutory notice requirements.

■ Plaintiff argues that a "postponement" within the meaning of section 2924g presupposes that the new sale date is a date on which a lawful sale may take place; conversely, postponement to any other sale date is invalid. Failure to give additional notice when a sale cannot legally occur on the date of postponement, frustrates the goal of the foreclosure process to have fair and open sales. The competitive bidding process would be destroyed because potential bidders would remain ignorant of the new sale date. Thus, plaintiff claims, defendants' technical compliance with the statutes was insufficient. For the following reasons, we reject plaintiff's argument.

First, as to the validity of the postponements, plaintiff cites no case in support of its contention that a postponement of a sale to a date on which

the sale cannot legally occur is unlawful. We have found no authority declaring that postponements are invalid if made during an automatic stay period. In fact, there is authority to the contrary.[7]

Next, we address plaintiff's argument that the postponements, combined with the failure to give new notice of the sale, destroyed the competitive bidding process.

That parties may abuse the right to postpone sales, in the hope of discouraging competitive bidding, has been recognized implicitly by the Legislature's amendment of the postponement and notice requirements of section 2924g.

Nonetheless, the postponements made by defendants and their failure to provide additional notice did not, in our view, necessarily destroy competitive bidding at the sale. Although potential bidders concededly would have been better informed had they received further notice of sale after the end of the stay, they did have other means to obtain the information they needed to bid at the sale.[8]

 Since defendants followed statutory procedures, potential bidders—including plaintiff—would have known of the postponed sale date had they attended the sale originally scheduled for October 21, 1977; had they attended subsequent postponed sales, they eventually would have been notified of the actual sale date of March 21, 1978.[9] Alternatively, they could have contacted the trustees. While these methods do require effort on the part of the bidders which could be avoided simply by the giving of a new notice of sale, they are reasonable and valid methods of obtaining notice. Failure to give new notice thus may have reduced the likelihood of competitive bidding; it would not have eliminated it. Thus, neither the postponements themselves nor defendants' failure to give additional notice rendered the sale invalid.

Beyond these facts, we note that plaintiff may at least in part have been responsible for the loss of its security interest. It was reasonable to assume

---

[7]Defendants cite *Matter of Roach* (9th Cir. 1981) 660 F.2d 1316, 1318-1319: "Notices of postponement of sale do not constitute violations of the automatic stay. . . . The purpose of the automatic stay is to give the debtor a breathing spell from his creditors . . . . [It] does not necessarily prevent all activity outside the bankruptcy forum."

[8]We note in conjunction with this fact that the intent of the notice of sale statutes is not to give actual notice, but only such notice as is "reasonably calculated to inform those who may be affected by a foreclosure sale." (*Lupertino* v. *Carbahal, supra,* 35 Cal.App.3d 742, 746-747.)

[9]As noted earlier, plaintiff has not claimed it was unaware of the statutory procedures and it has also conceded that defendants complied with them.

that, by virtue of the filing of the bankruptcy petition which stayed the sale, the sale would be postponed. Had a representative of plaintiff attended the October 21, 1977 sale, of course, it would have learned of the postponement dates and ultimately would have known of the date of sale, March 21, 1978.

Plaintiff offers no convincing reason for its failure to do so. It merely states that after it learned of the filing of the bankruptcy petition and the stay, it did not, on the advice of counsel, appear at the time and place originally indicated in the notice of sale. Plaintiff further states its belief at the time that a new notice of sale would be required. It denies either knowing or suspecting that a new sale date had been scheduled.

Furthermore, while it is unclear whether plaintiff contacted defendants during the stay period to obtain information regarding the sale of any likely postponements of it, the record discloses in any event that plaintiff, if not other bidders, *received actual notice* of the March 21, 1978, sale on March 3, 1978. Further, plaintiff appeared at the sale and refused to bid. Plaintiff's only justification for its failure to bid is: "among other reasons, it believed the sale was illegal."[10]

In light of the above, we conclude that the postponements of the sale were not unlawful; that new notice of sale was unnecessary because potential bidders had alternative methods of determining the new sale date; and that plaintiff's damages are questionable in that it in any event received actual notice of the sale and failed to bid, thereby contributing to the lack of competitive bidding.

There is insufficient substantial evidence to support a judgment in favor of plaintiff. The judgment of nonsuit was, therefore, proper as to this cause of action.

*Implied Covenant of Good Faith and Fair Dealing*

 Plaintiff's other argument is that an implied subordination agreement between plaintiff and defendants existed; that this agreement contained

---

[10]Plaintiff argues that if defendants had permitted it to assume the loan, it would have been able to bid at the sale and protect its interest. Defendants, however, did not have a duty to allow plaintiff to assume the loan at the time of the sale. Also, *Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943 [148 Cal.Rptr. 379, 582 P.2d 970], upon which plaintiff relies for the proposition that the due-on-sale clause was unenforceable, does not apply under the facts of this case. *Wellenkamp* was expressly given a prospective effect "when the lender, prior to [September 20, 1978], has . . . enforced the due-on clause, resulting in sale of the subject property by foreclosure or in discharge of the accelerated debt, or when the lender has waived enforcement of the due-on clause in return for an agreement with the new buyer modifying the existing financing." (*Id.*, at p. 954.) The sale in question here occurred in March 1978.

an implied covenant of good faith and fair dealing; and that defendants by their conduct breached this covenant.[11]

Our first step is to ascertain whether an implied subordination agreement did exist.

Plaintiff relies primarily upon *Middlebrook-Anderson Co.* v. *Southwest Sav. & Loan Assn.* (1971) 18 Cal.App.3d 1023 [96 Cal.Rptr. 338], and *Gluskin* v. *Atlantic Savings & Loan Assn.* (1973) 32 Cal.App.3d 307 [108 Cal.Rptr. 318]. These cases are distinguishable.

*Middlebrook* was a construction loan case. Plaintiffs were sellers who had agreed to subordinate their purchase money trust deeds by recording after a lender, relying on the lender to make voucher payments for construction purposes only. Subsequently, the lender, with full knowledge of the subordinating sellers' lien, disbursed funds for nonconstruction purposes. The court imposed an implied agreement between the seller and the lender that the lender's priority extended only to those funds properly disbursed.

*Middlebrook* and its progeny represent a departure from prior law that the senior construction lender had no duty to supervise disbursement of the loan funds. (See, e.g., *Spaziani* v. *Millar* (1963) 215 Cal.App.2d 667 [30 Cal.Rptr. 658].) The reasons for the *Middlebrook* decision lie in the strong public policy interests, given the seller's vulnerable position when he subordinates to a construction loan, compelling protection of the seller. (See *Gluskin* v. *Atlantic Savings & Loan Assn., supra,* 32 Cal.App.3d 307, 313-314.)

Here, we are concerned with an entirely different situation. The facts indicate that plaintiff received all of the cash proceeds from defendants' loan at the time of the sale to Sapps in 1975. As defendants point out, there were no funds to divert. Thus, the policy interests existing in the construction loan cases have no role here. As the court in *Gluskin* noted, "[t]he risk that the buyer-borrower will default in its obligation to the lender and that a foreclosure by the lender will follow is, of course, the very hazard to which a subordinating seller exposes himself by reason of a subordination agreement. In the abstract, there is no obligation on a lender to protect a subordinating seller from this risk." (*Id.,* at p. 315.)

---

[11]As indicated in footnote 2, the trial court made no express finding or ruling as to the breach of covenant argument and theory of recovery. The court did expressly find and hold that defendants owed no duty to plaintiff.

*Gluskin* is also inapposite. In that case, the court held that a lender and a borrower could not make material modifications of a loan to which the seller had subordinated, without the knowledge and consent of the seller, if that seller's rights were greatly affected thereby. (*Id.*, at p. 314.) The court found that the protection offered in decisions such as *Middlebrook* did not apply in *Gluskin,* because in the latter the seller had expressly waived any rights requiring the lender to supervise loan funds. But it imposed a duty on the lender to protect the seller because the unilateral, material modification affecting the seller's rights warranted protection of the seller for public policy reasons.

Here, unlike in *Gluskin,* there was no modification of a loan agreement, let alone one which destroyed the plaintiff's interest. (*Gluskin, supra,* at p. 315.) Further, although *Gluskin* demonstrates that policy considerations may justify the imposition of a duty upon a lender to protect a subordinating seller even in non-construction-loan situations, the facts here in our view do not warrant the imposition of such a duty. Plaintiff had actual notice of the sale.

We conclude that there was no implied subrogation agreement. Absent such agreement, plaintiff may not prevail on this cause of action and the judgment of nonsuit was proper.

The judgment is affirmed.

Racanelli, P. J., and Newsom, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 26, 1985.