[No. D034398. Fourth Dist., Div. One. May 25, 2001.]

RICHARD B. HICKS et al., Plaintiffs and Appellants, v.
E. T. LEGG & ASSOCIATES et al., Defendants and Respondents.

■■■■■■■■

■■■■■■■■

## COUNSEL

George McGill for Plaintiffs and Appellants.

Wingert, Grebing, Brubaker & Ryan, Norman A. Ryan and Brian P. Worthington for Defendant and Respondent E. T. Legg & Associates.

The Buckley Firm, Jonathan C. Cavett; Luce, Forward, Hamilton & Scripps, Charles A. Bird and Karen M. Clemes for Defendant and Respondent Executive Trustee Services, Inc.

## OPINION

**BENKE, Acting P. J.**—Under Civil Code[1] section 2924c, subdivision (e), the trustors under a deed of trust have the right to cure a default and reinstate the loan "at any time . . . until five business days prior to the date of sale" set forth in the initial or subsequent notice of sale or orally declared on the date of any postponement. Under section 2924g, subdivision (d), a foreclosure sale may not be held until seven calendar days after expiration of an injunction or bankruptcy stay that required the postponement of a sale. The issue here is whether the postponement of a foreclosure sale numerous times for five or fewer business days during the time a sale was enjoined or stayed—thereby precluding revival of an expired reinstatement period—violates legislative intent. As an apparent matter of first impression, we conclude it does not. We also hold that under the circumstances here, the serial postponements did not violate the implied covenant of good faith and fair dealing. Accordingly, we affirm the judgment.

### FACTUAL AND PROCEDURAL HISTORY

In 1991 Richard B. Hicks and Mafalda B. Hicks borrowed $935,000 from Bank of America (Bank) and executed a promissory note and deed of trust

---

[1]Statutory references are to the Civil Code unless otherwise specified.

encumbering their LaJolla property.[2] Bank recorded a notice of default in June 1996 after the Hickses became delinquent in their payments.

In September 1996 the Hickses filed a chapter 11 bankruptcy proceeding on behalf of a family trust to which they had transferred the property. The proceeding was dismissed several months later because the trust was an ineligible debtor.

In February 1997[3] Bank sold its interest in the security instruments to Norman J. Salter, Inc. (Salter), for $885,000. Salter immediately sold its interest in the security instruments to E. T. Legg & Associates (Legg) for $910,000. Under an arrangement negotiated by Philip Ram, who was associated with Salter, Legg agreed to pay Salter an additional $25,000 if Legg ultimately acquired the property through foreclosure. Ram also expected to be Legg's consultant or agent during foreclosure proceedings.

In mid-February, Executive Trustee Services, Inc. (Executive), recorded a notice of trustee's sale on March 10. The Hickses transferred the property to themselves individually and on March 3 filed another chapter 11 bankruptcy proceeding. On June 27 the bankruptcy court granted Legg's motion for relief from automatic stay. The court explained that there had been a lengthy history of nonpayment by the Hickses, and their recent agreement "to consider possibly listing the property is . . . too little, too late." The court, however, ordered that a foreclosure sale could not be held until July 28 to give the Hickses "a small window of time" to reinstate the loan "if [they] can." Legg instructed Executive to postpone the sale to July 28.

On July 10 the Hickses made a written request for reinstatement information from Legg. Legg asked Ram to calculate the amount to cure the default, and he provided the information to Legg's counsel, Paul Brent, on Friday, July 18. On July 21, shortly after 5:00 p.m., Brent sent the Hickses' counsel, George McGill, a letter by facsimile stating the amount to cure the default was then $179,565.78. Brent advised that "[b]y providing this information, [Legg] is not waiving any rights, nor does [it] concede that the [Hickses] have the right to reinstate the loan."

On July 24 the Hickses filed a complaint against Legg and Executive for declaratory and injunctive relief. The Hickses alleged that "[b]y virtue of Legg's failure and refusal to earlier provide [the] reinstatement amount,

---

[2]In 1991 the Hickses also borrowed $300,000 from Sterling Capital Corporation (Sterling), secured by a second deed of trust on the property. Sterling assigned its security interest to GE Capital Mortgage, which is not involved in this appeal.

[3]All further dates are in 1997 except where otherwise specified.

[they] are in dire jeopardy of being irreparably injured, . . . in that their five-business-day statutory reinstatement period is now contended by Legg to have expired." The Hickses also objected to the inclusion of appraisal, consulting and attorney fees in the reinstatement amount.

On the same date, the Hickses obtained a temporary restraining order (TRO) prohibiting a foreclosure sale, even though they filed no declaration showing they gave Legg 24 hours' notice of the ex parte hearing as required by local rule. According to Brent, he was notified by McGill on July 24 of an ex parte hearing on July 25. Legg nonetheless did not move to have the TRO dissolved.

Ram instructed Executive to postpone the foreclosure sale from July 28 to August 11. On July 30 the Hickses offered to pay Legg $126,218.31 to reinstate the loan "under Section 1500[] et seq." The Hickses, however, did not deposit that amount in an account in Legg's name.[4] Legg rejected the offer, stating: "a review of Section 1500 of the . . . Civil Code reveals that your correspondence is not a formal tender." Legg also complained that the Hickses wrongfully obtained the TRO.

On August 11 Ram instructed Executive to begin postponing the foreclosure sale for periods of five or fewer business days until a sale could legally be conducted. Executive complied and postponed the sale for short periods 25 times between August and December.

On October 8 and November 12, 14 and 19, the Hickses offered to pay Legg the following amounts, respectively, to reinstate the loan: $142,746.49; $178,466.26; $179,266.26, and $218,310.41. Legg expressly rejected the October 8 offer on the ground the reinstatement period had expired. Legg did not respond to the other offers.

On November 14 the court denied the Hickses' request for a preliminary injunction and dissolved the TRO. The court found the TRO was issued without proper notice to Legg "and would therefore have been subject to dissolution during the time of [its] effectiveness."

On November 19 the bankruptcy court's appellate panel issued a temporary stay of the foreclosure sale, effective through November 26. A sale was held on December 4, at which Legg acquired the property for $1 million.

---

[4]Section 1500 provides: "An obligation for the payment of money is extinguished by a due offer of payment, if the amount is immediately deposited in the name of the creditor, with some bank or savings and loan association within this state, of good repute, and notice thereof is given to the creditor."

In a fourth amended complaint, the Hickses added a cause of action against Legg and Executive to set aside the foreclosure sale, and a cause of action against Legg for breach of the implied covenant of good faith and fair dealing.[5] The Hickses again alleged Legg did not provide them with reinstatement information in a timely manner, improperly included appraisal, consulting and attorney fees in the reinstatement amount, and wrongfully rejected their offers to cure the default. The Hickses also alleged the defendants thwarted their statutory reinstatement rights by repeatedly postponing the foreclosure sale for periods of five or fewer business days, when a sale could not be held until seven days after the TRO was extinguished. The Hickses sought to have the sale set aside, or damages for wrongful foreclosure.

At trial, the Hickses argued the serial postponements were prohibited as a matter of law by the foreclosure statutes. The court, however, declined to decide the issue as one of law. Rather, it instructed the jury to determine whether defendants' conduct was a breach of the implied covenant of good faith and fair dealing.[6] The jury found in defendants' favor on all counts and judgment was entered for them on August 6, 1999.

## DISCUSSION

### I

*Statutory Scheme*

The Legislature has provided "a comprehensive framework for the regulation of a nonjudicial foreclosure sale pursuant to a power of sale contained in a deed of trust. [(§ 2924 et seq.)] The purposes of this comprehensive scheme are threefold: (1) to provide the creditor/beneficiary with a quick, inexpensive and efficient remedy against a defaulting debtor/trustor; (2) to protect the debtor/trustor from a wrongful loss of the property; and (3) to ensure that a properly conducted sale is final between the parties and conclusive as to a bona fide purchaser. [Citations.]" (*Moeller v. Lien* (1994) 25 Cal.App.4th 822, 830 [30 Cal.Rptr.2d 777].)

---

[5]The fourth amended complaint also included counts for conspiracy, fraud, negligent misrepresentation, intentional interference with prospective economic advantage, quiet title, slander of title, abuse of process, common count for money had and received, quasi-contract and injunction. These counts are not at issue on appeal.

[6]Although the Hickses named only Legg in their count for breach of the implied covenant of good faith and fair dealing, the jury was asked to determine whether Legg or Executive breached the implied covenant.

"Upon default by the trustor, the beneficiary may declare a default and proceed with a nonjudicial foreclosure sale. [Citations.] The foreclosure process is commenced by the recording of a notice of default and election to sell by the trustee. [Citations.] After the notice of default is recorded, the trustee must wait three calendar months before proceeding with the sale. [Citations.] After the 3-month period has elapsed, a notice of sale must be published, posted and mailed 20 days before the sale and recorded 14 days before the sale. [Citations.]" (*Moeller v. Lien, supra,* 25 Cal.App.4th at p. 830.)

The trustors have a right to reinstate the loan by paying delinquencies and specified costs, or tendering payment, "at any time . . . until five business days prior to the date of sale set forth in the initial recorded notice of sale." (§ 2924c, subd. (e); 4 Miller & Starr, Cal. Real Estate (3d ed. 2000) §§ 10:186, 10:188, pp. 552, 555.) "In the event . . . the sale is postponed . . . , and, *the postponement is for a period which exceeds five business days from the date set forth in the notice of sale, or declared at the time of postponement,* then the right of reinstatement is revived as of the date of postponement and shall continue from that date until five business days prior to the date of sale declared at the time of the postponement." (§ 2924c, subd. (e), italics added.)

The trustee is required to postpone a sale "upon the order of any court of competent jurisdiction, or where stayed by operation of law." (§ 2924g, subd. (c)(2); 4 Miller & Starr, *supra,* § 10:186, p. 553.) These types of postponements do not require a new recorded notice of sale and may be orally announced. (§ 2924g, subd. (d).) A foreclosure sale "shall be conducted no sooner than on the seventh day after the earlier of (1) dismissal of the action or (2) expiration or termination of the injunction, restraining order, or stay (which required postponement of the sale), . . . unless the injunction, restraining order, or subsequent order expressly directs the conduct of the sale within that seven-day period." (*Ibid.*)

II

*Legislative Intent*

The Hickses contend the defendants' repeated postponement of the foreclosure sale for periods of five or fewer business days violated legislative intent. They assert that sections 2924c, subdivision (e), and 2924g, subdivision (d), must be harmonized to guarantee revival of an expired

reinstatement period when an injunction, bankruptcy proceeding or other legal impediment precludes a sale for an indeterminate time.[7]

■ Issues of statutory interpretation are subject to our independent review. (*Board of Retirement v. Lewis* (1990) 217 Cal.App.3d 956, 964 [266 Cal.Rptr. 225].) ■ "The objective of statutory interpretation, of course, is to ascertain and effectuate legislative intent. If the words are clear, a court may not alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.] At the same time, however, a statute is not to be read in isolation; it must be construed with related statutes and considered in the context of the statutory framework as a whole. [Citation.] A court must determine whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other related provisions." (*Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 986 [44 Cal.Rptr.2d 93].)

■ In March 1985 Assemblyman Gerald Eaves introduced Assembly Bill No. (Assembly Bill) 1441 (1985-1986 Reg. Sess.) to amend section 2924g, subdivision (d). The purpose of the amendment was not to extend the trustor's reinstatement rights, but to "provide sufficient time for a trustor to find out when a foreclosure sale is going to occur following the expiration of a court order which required the sale's postponement" and "provide the trustor with the opportunity to attend the sale and to ensure that his or her interests are protected." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1441 (1984-1985 Reg. Sess.) as amended May 15, 1985, p. 1.) The bill was sponsored by the Western Center on Law and Poverty in response to an incident in which a foreclosure sale was held one day after a TRO was dissolved. The property was sold substantially below fair market value. The trustor, who had obtained a purchaser for the property, did not learn of the new sale date and was unable to protect his interests at the sale.

Assembly Bill 1441 originally required the trustee to publish a new notice of sale when a sale was indefinitely postponed by court order or by operation of law, thus giving the trustor at least 20 days' notice of the new sale date. (Assem. Bill 1441 (1985-1986 Reg. Sess.) as introduced Mar. 5, 1985.) The measure was opposed by lenders and title companies because the requirement of a new published notice of sale would increase the debtor's costs of

---

[7]The Hickses rely on the following comment in Miller and Starr: "It is common practice to postpone the sale for a period less than five days (such as four days), and then postpone it again for another period less than five days (such as another four days) so that the sale is held after the required seven days [under § 2924g, subd. (d)] but the trustor is deprived of the right of reinstatement [under § 2924c, subd. (e)]. This practice clearly violates legislative intent, and may be an unfair business practice or breach of the implied covenant of good faith and fair dealing, but to date the practice has not been challenged." (4 Miller & Starr, *supra,* § 10:201, p. 615, fn. omitted.) We note that Miller and Starr cites no supporting legislative history materials.

foreclosure proceedings. (David K. Milton, Cal. League of Savings Insts., letter to Assemblyman Eaves, May 9, 1985; Kenneth W. Cooley, Cal. Land Title Assn., letter to Assemblyman Eaves, Apr. 23, 1985.) Therefore, the requirement of a new published notice was deleted and a minimum 10-day interval was required between the expiration of an injunction or stay precluding a sale and the date of sale. (Assem. Amend. to Assem. Bill 1441 (1985-1986 Reg. Sess.) May 15, 1985.)

Trustees objected to a rule that would invariably delay a foreclosure sale after expiration of an injunction or stay. In their view, "[Assembly Bill 1444] would actually allow sophisticated trustors to an additional procedural device to extend the entire process. . . . [T]he proposed 10 day period arises at the conclusion of a lengthy process (a 4-5 month period of delinquency on the loan, plus 3 months from recording of the notice of default, plus 1 month from the notice of sale) which averages a minimum of 8 to 9 months. During these 8 to 9 months the trustor is entitled to numerous ways to cure the default, whereas the lender is not receiving payment on the loan. However, the 'hands-on' experience of trustees evidences a pattern of abuse by defaulting trustors whereby frivolous legal devices are used to unfairly extend the nonjudicial foreclosure process. . . .

"[For example,] a trustor will (1) file bankruptcy and be granted a stay of the nonjudicial foreclosure sale notwithstanding the fact that secured property is always granted a relief from the stay order, (2) seek a TRO to set aside the sale for alleged impropriety, or (3) a combination of both (1) and (2) . . . . [I]t is not uncommon for 2 to 3 years to elapse from the initial delinquency to the actual sale. During this time the borrower owns the property, payment free, whereas the lender . . . is deprived of [its] entitled payments. [Assembly Bill] 1441 would exacerbate these examples by allowing a sophisticated trustor an additional 10 days to strategize to delay the sale." (Ralph F. Simoni, Esq., letter to Assemblyman Eaves, Aug. 1, 1985, original underscoring.)

Western Center on Law and Poverty proposed a compromise that would give the court discretion to waive the 10-day waiting period based on the trustor's fraud. Lenders, however, preferred that the court be given broader authority to waive the waiting period. (Michael J. Arnold, Mortgage Brokers Inst., letter to Assemblyman Eaves, July 15, 1985; Stanley M. Zimmerman, Home Budget Loans, letter to William Powers, July 26, 1985.) A lender also urged shortening the 10-day interval to 7 days "in order to encourage standardized trustee sales dates." (*Ibid.*) In the final version of Assembly Bill 1441, section 2924g, subdivision (d) was amended to substantially its current form, requiring a minimum 7-day interval between the expiration of an

injunction or stay precluding a sale and the date of sale, absent a court order allowing an earlier sale. (Assem. Amend. to Assem. Bill 1441 (1985-1986 Reg. Sess.) Sept. 4, 1985.)

The addition of section 2924c, subdivision (e) was proposed only in the fifth and final version of Assembly Bill 1441, and the legislative history contains scant information on the measure. In his statement to the Senate Committee on Judiciary, Assemblyman Eaves explained: "My bill will extend the period during which reinstatement of a defaulted mortgage loan may occur. Under existing law, the debtor is granted a three month period within which to effect a reinstatement of his loan. My bill will extend that reinstatement period to five business days prior to the date of sale. In effect, this amendment grants debtors a minimum additional two weeks during which they may cure their loan and reinstate their deed of trust or mortgage." (Assesmblyman Eaves, Author's Statement to Sen. Com. on Judiciary (1985-1986 Reg. Sess.).)

Contrary to the Hickses' position, the seven-day waiting period of section 2924g, subdivision (d) appears wholly unrelated to the reinstatement provisions of section 2924c, subdivision (e). Moreover, in section 2924c, subdivision (e), the Legislature expressly provided for revival of the trustors' reinstatement rights when a sale is postponed and a subsequent notice of sale must be recorded. The trustee has the discretion to postpone a foreclosure sale, but a new recorded notice of sale is required if there are more than three postponements. (§ 2924g, subd. (c)(1).) Had the Legislature desired to revive the reinstatement period when a sale is orally postponed because of an injunction or bankruptcy stay, it could easily have done so. ■ " 'It is a well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded. [Citations.]' [Citation.]" (*Suman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 10-11 [28 Cal.Rptr.2d 133].)

■ Further, we must presume the Legislature was aware of judicial interpretations of the foreclosure statutes when it enacted Assembly Bill 1441. (*People v. Cruz* (1996) 13 Cal.4th 764, 774 [55 Cal.Rptr.2d 117, 919 P.2d 731].) In *United States Cold Storage v. Great Western Savings & Loan Assn.* (1985) 165 Cal.App.3d 1214 [212 Cal.Rptr. 232], which was decided several months before the final version of Assembly Bill 1441 was considered, the court held the lender's postponements of a sale to dates a bankruptcy stay was in effect were valid. The court "found no authority declaring that postponements are invalid if made during an automatic stay period." (165 Cal.App.3d at p. 1229; see also *California Livestock Production Credit*

*Assn. v. Sutfin* (1995) 165 Cal.App.3d 136, 141 [211 Cal.Rptr. 152] [discussion regarding serial postponements of foreclosure sale during bankruptcy stay].) In adding section 2924c, subdivision (e), the Legislature extended the trustors' right of reinstatement in certain respects, but it did not disapprove of the postponement of a sale to dates on which a sale cannot legally occur.

We cannot attribute to the Legislature an intent to prohibit, as a matter of law, the postponement of a foreclosure sale for successive periods of five of fewer business days during the period a sale is precluded by an injunction or bankruptcy stay. Neither the text of sections 2924c, subdivision (e), and 2924g, subdivision (d), nor the legislative history of Assembly Bill 1441 supports that theory.

### III

*Implied Covenant of Good Faith and Fair Dealing*

#### A

Alternatively, the Hickses contend defendants violated the implied covenant of good faith and fair dealing. Defendants assertedly "thwart[ed] [their] reasonable expectation of an ability to exercise their reinstatement right under [the] contract (and as a matter of statutory entitlement)." The Hickses cite paragraph 18 of the trust agreement, which provided in part: "If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument."

" ' "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." [Citation.] . . .' [¶] The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith. [Citations.]" (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371-372 [6 Cal.Rptr.2d 467, 826 P.2d 710].)

"In the case of a discretionary power, it has been suggested the covenant requires the party holding such power to exercise it 'for any purpose within the reasonable contemplation of the parties at the time of formation—to capture opportunities that were preserved upon entering the contract, interpreted objectively.' [Citation.] [¶] It has also been suggested the covenant is

not susceptible to firm definition but must be examined on a case-by-case basis. Instead of defining what is consistent with good faith and fair dealing, it is more meaningful to concentrate on what is prohibited. [Citation.]" (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc., supra,* 2 Cal.4th at p. 372.) "It is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. [Citations.]" (*Id.* at p. 373.) The issue of whether the implied covenant of good faith and fair dealing has been breached is ordinarily "a question of fact unless only one inference [can] be drawn from the evidence." (*Paulfrey v. Blue Chip Stamps* (1983) 150 Cal.App.3d 187, 194 [197 Cal.Rptr. 501].)

■ "When a judgment is attacked as being unsupported by the evidence, 'the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the [trier of fact].' [Citation.]" (*PWS, Inc. v. Ban* (1991) 234 Cal.App.3d 223, 230 [285 Cal.Rptr. 598].) ■ Here, the jury could reasonably conclude that the Hickses surreptitiously obtained the TRO without notice to Legg. Under that circumstance, the Hickses could not reasonably expect a revival of the reinstatement period to be a benefit of the contract. (See § 3517 ["No one can take advantage of his own wrong."].) The jury's finding that the defendants did not breach the implied covenant is supported by substantial evidence.[8]

### B

Additionally, the Hickses challenge the sufficiency of the evidence to support the jury's finding that Legg did not breach the implied covenant by failing to provide them with reinstatement information in a timely manner.

The notice of default required the Hickses to make any request for reinstatement information in writing. The foreclosure statutes specify no deadline by which a beneficiary or trustee must provide reinstatement information once it is requested. As discussed, the Hickses made a written

---

[8]Defendants contend that as a matter of law, the serial postponement of a foreclosure sale for five or fewer business days cannot give rise to liability for breach of the implied covenant. They rely on the following paragraph of section 2924c, subdivision (e): "Pursuant to the terms of this subdivision, no beneficiary, trustee, mortgagee, or their agents or successors shall be liable *in any manner* to a trustor, mortgagor, their agents or successors . . . for the failure to allow a reinstatement of the obligation secured by a deed of trust or mortgage during the period of five business days prior to the sale of the security property, and no such right of reinstatement during this period is created by this section. Any right of reinstatement created by this section is terminated five business days prior to the date of sale set forth in the initial date of sale, and is revived only as prescribed herein and only as of the date set forth herein." Given our holding, we need not decide the issue.

request on July 10, 1997; Ram completed the calculations and sent them to Legg's counsel, Brent, on Friday, July 18; and, Brent sent the information to the Hickses counsel, McGill, by facsimile at 5:06 p.m. on Monday, July 21. The Hickses assert the reinstatement information came "too late," because July 21 was the last day they could reinstate the loan as a matter of right before the foreclosure sale scheduled on July 28.[9]

Ram testified he believed it was important to calculate the reinstatement amount as quickly as possible. However, when Legg requested the information, his daughter was in New York for "very major cranial facial surgery." Ram's wife accompanied their daughter to New York and he was in Los Angeles caring for their five-year-old son. Ram explained he was able to work only "very occasionally" and not "much focused on . . . a lot of things in the office at that time."

Legg's showing was not overwhelming, but we conclude the jury's finding of a lack of bad faith is supported by substantial evidence. In any event, it appears there is no nexus between Legg's provision of reinstatement information on July 21 and the ultimate foreclosure on the property. Legg postponed the foreclosure sale from July 28 to August 11, giving the Hickses additional time to reinstate the loan if they were able to do so. They supposedly tried to reinstate the loan on July 30 under section 1500, but the jury could reasonably conclude the tender was ineffective because they made no deposit of funds.[10] Given the lack of causation, we need not consider the Hickses' additional contentions that Executive breached the implied covenant by not independently providing them with reinstatement information before July 21 and that the court improperly instructed the jury on the issue.

## C

■ The Hickses also assert the court erred by refusing to give offered instructions on the implied covenant issue. ■ "[A] party has the right to

[9]Legg asserts the Hickses' right of reinstatement extended through Tuesday, July 22, because Saturday, July 26, was a "business day" within the meaning of section 2924c, subdivision (e). (See also §§ 7, 7.1 & 9.) Reinstatement, however, is not a matter of right "during the period of five business days *prior* to the date of sale." (§ 2924c, subd. (e), italics added.) Even if July 26 were a "business day," July 22 was among the five business days (July 22-26) prior to the sale scheduled on July 28.

[10]The Hickses also offered to pay substantially less than Legg demanded to cure the default, but Legg did not object to the offer on that ground. "The person to whom a tender is made must, at the time, specify any objection he may have to the money, instrument, or property, or he must be deemed to have waived it; and if the objection be to the amount of money, . . . he must specify the amount . . . he requires, or be precluded form objecting afterwards." (Code Civ. Proc., § 2076; see also Civ. Code, § 1501.) Because the amount of the Hickses' July 30 tender is not at issue, we need not consider their arguments regarding attorney fees and other costs that ostensibly should not have been included in the reinstatement amount.

have the jury instructed on his or her theory of the case, but has no right to require the court [to] use any particular phraseology; as long as the court correctly instructs on the issue, it is free to modify an instruction or give one of its own in lieu of the one offered. [Citations.]" (*Byrum v. Brand* (1990) 219 Cal.App.3d 926, 939 [268 Cal.Rptr. 609].) Refusal to give a proposed instruction is reversible only where " 'the omission misleads and confuses the jury and it is reasonably probable a result more favorable to the requesting party would have been reached in the absence of the error. [Citations.]' [Citation.]" (*Ibid.*) "The appellate court must examine all the circumstances of the case, including the evidence and the other instructions given, . . . to determine whether the probable effect of specific instructions has been to mislead the jury and thus to prejudice a party. [Citation.]" (*Ibid.*)

██ The Hickses requested the following special instruction: "Where a court has issued a temporary restraining order or stay preventing the conduct of a foreclosure sale, postponements of the sale must be made for a proper purpose and in good faith, and not for any improper purpose, such as thwarting or impeding competitive bidding at the sale, or preventing or frustrating a trustor's right of reinstatement. In this case, therefore, if you find [Executive] postponed the foreclosure sale to dates within a temporary restraining order or other stay time period upon which it knew the sale could not be conducted, you may find the conduct of [Executive] to have been not in good faith, unfair to plaintiffs or otherwise unreasonable."

The Hickses also requested this special instruction: "A contract may give one of the parties power to take certain actions to protect his/her/its interests or to make sure that he/she/it will receive the benefits of the contract. When the contract does this, the implied promise of good faith and fair dealing requires the party to act in good faith and to deal fairly with the other party in deciding whether to use that power and in deciding what actions to take. This means that the party who is given a power to do something to protect his/her/its own interests may not use that power to unreasonably or unfairly harm the other party or to deprive the other party of the benefits of the contract.

"In this case, the note and deed of trust contract among plaintiffs and Bank of America, to which defendant Legg claims to have succeeded, as interpreted under California statutory provisions, gave plaintiffs the right to cure any default and to reinstate the contract in good standing within certain time periods. The promise of good faith and fair dealing that was implied by law in the contract required . . . Legg to act in good faith and to deal fairly with plaintiffs in connection with plaintiffs' reinstatement right. Therefore, such covenant of good faith and fair dealing required that . . . Legg not

attempt to deprive plaintiffs of their reinstatement right in a way that would unreasonably or unfairly injure plaintiffs or deprive plaintiffs of the benefits of the contract."

We conclude the court's refusal to give the instructions did not prejudice the Hickses. The court instructed the jury that a foreclosure sale may not be "postpon[ed] . . . for any purpose which is improper, such as thwarting or impeding competitive bidding at the sale, or preventing or frustrating a trustor's claimed right of reinstatement." The court's instruction sufficiently conveyed the law, but more succinctly than the Hickses' offered instructions.

## IV

### *Publication of Notice of Sale*

■ We also reject the Hickses' contention that the foreclosure sale is invalid because Executive's third notice of sale, published on March 4, violated the automatic bankruptcy stay that arose on March 3 when they filed their second bankruptcy proceeding.[11]

In *Matter of Roach* (9th Cir. 1981) 660 F.2d 1316, the court held that the publication of a notice of postponement of sale did not violate the automatic stay. (*Id.* at p. 1318.) The court explained: "The purpose of the automatic stay is to give the debtor a breathing spell from his creditors, to stop all collection efforts, harassment and foreclosure actions. [Citations.] The automatic stay also prevents piecemeal diminution of the debtor's estate. [Citation.] The automatic stay does not necessarily prevent all activity outside the bankruptcy forum. [Citation.] [¶] Here, the Bank merely maintained the status quo, and did not harass, interfere or gain any advantage. This is consistent with the purpose of the automatic stay provision. [Citation.]" (*Id.* at pp. 1318-1319.) In *In re Peters* (9th Cir. 1996) 101 F.3d 618, 619, the court held the reasoning of *Roach* is applicable in the postconfirmation context because postponements merely continue to maintain the status quo.

In *Tully v. World Savings & Loan Assn.* (1997) 56 Cal.App.4th 654 [65 Cal.Rptr.2d 545], the court held that a third notice of sale published the same day the debtors filed bankruptcy did not violate the automatic stay. The court relied on *Matter of Roach, supra,* 660 F.2d at pages 1318-1319, in concluding "that the publishing of notice by coincidence on the same date the debtors filed a petition in bankruptcy does not upset the status quo and does

---

[11]Section 2924f, subdivision (b), requires that "notice of the sale . . . shall be given by posting a written notice . . . and publishing a copy once a week for three consecutive calendar weeks."

not harass or interfere with the debtors or give any advantage to the lender." (*Tully v. World Savings & Loan Assn., supra,* 56 Cal.App.4th at p. 662.) Here, similarly, the publication of the third notice of sale one day after the automatic bankruptcy stay issued did not violate the underlying policy of the stay.

In any event, the Hickses were required to raise their claim in the bankruptcy court. " 'The bankruptcy court ha[s] jurisdiction over all claims alleging willful violation of the automatic stay.' [Citation.] The existence of a federal remedy for violation of the stay must be read as an implicit rejection of state court remedies. [Citation.]" (*Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1109 [51 Cal.Rptr.2d 286].)

### DISPOSITION

The judgment is affirmed. Legg and Executive are awarded costs on appeal.

McDonald, J., and McIntyre, J., concurred.

Appellants' petition for review by the Supreme Court was denied August 8, 2001.