Filed 7/11/14  Zamora v. PNC Bank CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| STEVEN J. ZAMORA,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>PNC BANK, N.A. et al.,<br><br>    Defendants and Respondents. | A139604<br><br>(Alameda County<br>Super. Ct. No. RG09488853) |

Plaintiff Steven J. Zamora borrowed approximately $875,000 from the predecessor in interest of defendant PNC Bank.[1]  After a number of plaintiff's causes of action were resolved by demurrer, the trial court granted summary adjudication on the remaining causes of action, thus permitting entry of the judgment from which plaintiff appeals.  Plaintiff contends that the judgment is procedurally defective in that it is based upon evidence that should not have been considered.  We conclude this contention is without merit.  We further conclude that none of plaintiff's arguments against the validity of the summary adjudication rulings is a ground for reversal.  Thus, we affirm.

---

[1] PNC Bank describes itself as the "successor by merger to National City Bank," the actual lender to plaintiff.  It appears that the two loans subsequently ended up in a "Home Equity Trust" and a "Mortgage Loan Trust."  Defendant Deutsche Bank National Trust Co. is the trustee for both, and defendant Wells Fargo Bank is the "Master Servicer" for the two trusts.  (See fn. 4, *post*.)  Their involvement in this appeal is purely nominal.  Nevertheless, they will be included with PNC Bank in the collective designation "defendants."

1

**BACKGROUND**

Plaintiff commenced this action in December 2009, but the pleading stage came to an end only when defendants' general demurrer was sustained in May 2012, leaving only eight of the 15 causes of action alleged in plaintiff's 113-page verified third amended complaint. Plaintiff agreed with defendants when they stated: "After this Court's ruling on Defendants' demurrer to the Third Amended Complaint, the only remaining causes of action against Defendants are for violations of Business and Professions Code sections 17200 (first) and 17500 (second); intentional misrepresentation (third); wrongful foreclosure (eighth); restitution (rescission) (ninth); restitution (unjust enrichment) (tenth); civil conspiracy (thirteenth); quiet title (fourteenth); and declaratory relief (fifteenth)." Plaintiff's brief addresses only these causes of action. And so do we, addressing them in the same order as in plaintiff's brief.[2]

The trial court's order on defendants' motion includes a concise summary that we adopt as our own (with minor nonsubstantive editorial changes):

"This action arises out of a purchase money loan ('Subject Loan') in the amount of $700,000.00 obtained by Plaintiff from National City Mortgage on about October 13, 2006 for the purchase of the property commonly known as 117 Colgett Drive, Oakland, California ('Subject Property'). Plaintiff also secured a second loan from National City Mortgage in the amount of $175,000.00 ('Second Loan') to finance the purchase of the Subject Property, which was purchased for $875,000.00. The Subject Loan and the

---

[2] On this appeal plaintiff challenges only the summary adjudication ruling. Although plaintiff could have challenged the demurrer ruling on this appeal from the judgment of dismissal (*Jennings v. Marralle* (1994) 8 Cal.4th 121, 128), all arguments in his brief are directed at the summary adjudication ruling. Thus, any appeal from the order terminating plaintiff's causes of action for an accounting (fourth), constructive fraud (sixth), "fraud in the factum" (seventh), and "fraud (no standing)" (twelfth), will be treated as abandoned. The same is true for those causes of action not covered by the demurrer and not mentioned in plaintiff's brief, namely the causes of action for negligence (fifth), and "violations" of what plaintiff designated "the Fair Debt and Collection Practices Act" (actually, just the Fair Debt Collection Practices Act; see 15 U.S.C. § 1692 et seq.) (eleventh).

Second Loan were secured by deeds of trust in favor of National City Mortgage, a Division of National City Bank, PNC's predecessor in interest.

"Plaintiff received and signed documents at closing including the Promissory Note, Deed of Trust and Truth-in-Lending ('TILA') Disclosure for the Subject Loan. Plaintiff testified at deposition that he has been a licensed real estate broker since 2004, and studied mortgages as part of obtaining that license.

"The only discussions Plaintiff had about the Subject Loan terms prior to closing were with his mortgage broker, Platinum Group Funding. Plaintiff believed he would receive an adjustable rate loan, at a 6.5% interest rate (not a 6.5% Annual Percentage Rate which treats certain fees as interest), with the initial monthly payment of $3,791.67, which would adjust after five years based upon the applicable index. Plaintiff did not discuss the amount financed, finance charge or total payments with Platinum Group Funding prior to closing. Plaintiff understood that his initial monthly interest-only payments would be $3,791.67 for the first five years of the repayment period and that he would have an APR (not an interest rate) of 7.53%. The signed TILA Disclosure has a facsimile transmission date within five days of the closing in October 2006. There is an unsigned non-final TILA Disclosure which also sets forth a monthly payment total of $3,791.67. A comparison of the signed 'final' TILA with the HUD-1 form which Plaintiff admits was correct, reflects that the signed TILA actually overdisclosed finance charges.

"Plaintiff did not make the November or December 2008 monthly payments. Plaintiff made monthly interest payments in the amount of $3,791.67 on the Subject Loan up to October 2008, when he claims he called National City to inquire about a possible refinance. Plaintiff claims that one or more people at National City, whom he is unable to identify, advised him that his monthly payment would increase before the five-year fixed interest payment was to adjust. On October 30, 2008, Plaintiff filled out an online Hardship Form, stating among other things that:

"(1) He could not afford a monthly payment of more than $1,800.00;

"(2) He was experiencing business failure from 2007 continuing through 2008; and

"(3) The property was worth $250,000.00 less than he paid for it.

"Although Plaintiff testified that his financial condition improved after he submitted the Hardship Form, he could not and has not identified any documents reflecting the alleged improvement. Plaintiff has also refused to produce any documentation from October 2008 through the present reflecting his financial condition. Plaintiff has not made any payment on the Subject Loan since the October 2008 payment.[3]

"Plaintiff claims that in November 2008, as a result of the suggestion that his payments were to increase, he spoke to National City's Ronald Weakly, who orally promised him modified loan terms. PNC's servicing notes would have indicated if any modification of the Subject Loan had been provided to Plaintiff by PNC. PNC's servicing notes do not reflect that Plaintiff was ever promised a loan modification by Ronald Weakly or any other PNC representative. Plaintiff admits that no written loan modification was ever signed with respect to the Subject Loan.

"National City extended a proposed forbearance agreement to Plaintiff in December 2008, with a $1,800,00 payment due on the first of each month for the months of January 2009, February 2009 and March 2009, however, PNC's records reflect that no payment was ever received from Plaintiff toward the forbearance agreement. Plaintiff has further been barred from presenting any claim that he made payments toward the forbearance agreement or asserting that he made such payments in this action due to his

---

[3] It fairly appears from a stipulation between the parties that the October payment was in fact tendered and/or received on November 3, 2008. The stipulation was extracted from plaintiff in order to avoid a decision on defendants' "motion . . . for further sanctions including terminating and monetary sanctions," which they made because plaintiff refused to produce evidence substantiating any subsequent payments.

4

failure to produce any evidence of such payments in response to discovery requests and court orders.

"Based upon Plaintiff's delinquency, a notice of default was recorded by Defendant, and foreclosure trustee, Cal-Western Reconveyance Corp. on May 4, 2009, listing a reinstatement amount of $27,581.33.

"After the Notice of Default in May 2009 and prior to the sale of the Subject Property in March 2010, PNC invited Plaintiff to submit financials for a potential loan modification review, but he never returned the requested financials required to complete the review. A Notice of Trustee Sale listing an estimated total amount of $747,377.27 consisting of the unpaid loan balance, costs, expenses and advances was recorded on August 25, 2009. After a period of making no payments for nine months, Plaintiff claims he offered to tender approximately $700,000.00 to rescind the loan in about August 2009.

"However, he has produced no evidence of his financial condition or his ability to make a tender of $700,000.00 and admitted that the combined balance of his bank accounts has never been more than $700,000.00. Plaintiff never tendered or offered to tender $747,377.20, the amount listed in the Notice of Trustee Sale, and admits that any offer to tender depended upon 'correct accounting.' Plaintiff further failed to post a $90,000.00 bond to prevent the court from dissolving the preliminary injunction in this matter in early 2010.

"Plaintiff vacated the Subject Property in May 2010. Plaintiff has benefitted by living in the property free in the amount of at least $72,041.73, which represents 19 months of non-payment between November 2008 and May 2010.

"The Subject Loan was sold by National City Mortgage Co. to Goldman Sachs and the n securitized by Goldman and became part of a loan pool[4] of which Deutsche

---

[4] "Ownership of mortgage loans has changed dramatically since the era of loan securitization began in the early 1960s. A significant portion of loans originated by financial institutions have been packaged and sold off onto loan pools held by tax-favored investment vehicles called 'real estate mortgage investment conduits' (REMICs). REMICs are passive title-holding entities that sell to investors interests in the loan pool commonly known as mortgage-backed securities. Each loan pool serves as collateral for

5

Bank National Trust Co. served as the trustee. National City Mortgage Co., PNC's predecessor in interest, was the servicer of the Subject Loan until PNC succeeded to its interests by merger in November 2009.

"Since November 2009, PNC has been the servicer of the Subject Loan acting on behalf of Deutsche Bank National Trust Co. with respect to the servicing of the Subject Loan and initiating and completing the foreclosure on the Subject Property.

"Here, the Trustee's Deed Upon Sale recites that the statutory requirements have been met. The $27,581.33 amount listed in the Notice of Default is made up of seven missed payments (November 2008—May 2009) at $3,803.49 per month = $26,624.43 + Late Charges = $947.90 + Property inspection fees + $9.00. The monthly increase from $3,791.67 to $3,803.50 was proper because of a lapse of insurance (a forced placed lapse premium of $142.00 was disbursed from escrow on April 14, 2009 and a payment change was performed to add a monthly shortage of $11.83 a month ($142.00 divided by 12) to the payment to collect the lapsed premium.

"The $747,377.27 amount listed in the Notice of Trustee Sale which is the total amount of the unpaid balance of the obligation secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale. Plaintiff does not deny that he was aware of the notices regarding the foreclosure sale.

"Plaintiff never advised PNC or its predecessor National City of any specific servicing dispute. National City provided a sufficient response to Plaintiff's QWR and Plaintiff admits in the Third Amended Complaint that PNC acknowledged receiving his purported QWR."

---

repayment of amounts payable to investors on account of the securities issued by the owner of that pool. The rights and obligations of the agents who service the loan pools are governed by contracts called 'pooling and servicing agreements.' Typically there is an administrative or master servicer who collects payments from borrowers, administers the loans, and remits . . . payments to investors." (Bernhardt et al., Cal. Mortgages, Deeds of Trust, and Foreclosure Litigation (Cont.Ed.Bar 4th ed. 2014) § 10.7A, p. 10-32 (Bernhardt).)

The trial court granted summary adjudication on all nine of the remaining causes of action and ordered entry of a judgment dismissing all of plaintiff's causes of action. From that judgment entered in due course, plaintiff perfected this timely appeal.

## REVIEW

One matter must be addressed at the outset. Plaintiff continues to represent himself. His in propria persona status brings him no special privileges. "A lay person . . . who exercises the privilege of trying his own case must expect and receive the same treatment as if represented by an attorney—no different, no better, nor worse." (*Taylor v. Bell* (1971) 21 Cal.App.3d 1002, 1009.) Plaintiff is " ' "restricted to the same rules of evidence and procedure as is required of those qualified to practice law before our courts." ' " (*City of Los Angeles v. Glair* (2007) 153 Cal.App.4th 813, 819.) "[T]he rules of civil procedure must apply equally to parties represented by counsel and those who forego attorney representation." (*Rappelyea v. Campbell* (1994) 8 Cal.4th 975, 984-985.)

### The Trial Court Made No Erroneous Evidentiary Rulings

Before proceeding to the merits, we address plaintiff's claims that the trial court committed a number of erroneous evidentiary rulings in connection with the summary adjudication motion.

PNC Bank's motion was supported by the declarations of Brian Arthur and Mark Hiney, both of whom are PNC Bank employees. Each of the declarations had a number of authenticated exhibits attached. In addition, PNC Bank requested the court take judicial notice of 15 documents attached as exhibits. Exhibits A to F were various instruments "in the Official Records of Alameda County" that had been generated by the loans to plaintiff and the ensuing foreclosure. Exhibits G to L were documents in the court's file. The remaining three documents were described as follows: "**Exhibit M**—California Department of Real Estate Record reflecting that Plaintiff is and has been a licensed real estate broker in California since 2004. [¶] **Exhibit N**—'History of PNC Bank National Association (FDIC Cert: 6384),' from the FDIC Website. [¶] **Exhibit O**—Official certification of the Comptroller of the Currency to merge National City Bank with and into PNC Bank, National Association, effective November

7

6, 2009." To judge from PNC Bank's separate statement, the point of the declarations and the exhibits was to establish the regularity of the procedures used by PNC Bank in making the loans to plaintiff and in the nonjudicial foreclosure pursuant to the deeds of trust and other authorizing documents executed by plaintiff at the time of the loans.

Plaintiff interposed dozens of objections to the Arthur and Hiney declarations, all of which were overruled. The court implicitly overruled plaintiff's partial opposition to PNC Bank's request for judicial notice, and granted the request.

### The Declarations

The statute governing the summary adjudication procedure specifies that "Supporting and opposing affidavits or declarations shall be made by any person on personal knowledge, shall set forth admissible evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavits or declaration." (Code Civ. Proc., § 437c, subd. (d).) Plaintiff contends the trial court abused its discretion in overruling his objections to the Arthur and Hiney declarations because they did not satisfy this standard "and are nothing but self-serving inadmissible hearsay." Plaintiff also claims that the court should have sustained his objections that the declarations were without adequate foundation and authentication. We do not agree.

The statutory requirements of personal knowledge and competence "must be shown by facts set forth in the affidavit or declaration and not merely by conclusory statements to that effect. The bare statement that the facts are within the affiant's or declarant's knowledge does not fulfill the requirements where the facts set forth do not show this. [Citations.] The text of the affidavit or declaration itself must demonstrate the requisite personal knowledge and competency." (6 Witkin, Cal. Procedure (5th ed. 2008) Proceedings Without Trial, § 225, p. 666.)

Declarant Arthur stated: "I have personal knowledge of the facts set forth herein and if called upon to do so, I could and would testify competently thereto. [¶] I hold the position of Assistant Vice President at PNC's Mortgage Services, Default Division. I work out of PNC's Miamisburg, Ohio offices. As part of my duties at PNC, I have knowledge of how the files and documents pertaining to foreclosure related litigation in

8

general are received, maintained and kept in the usual course of business. I also have particular knowledge of those records with respect to Loan Number 4908454 ('Subject Loan'), the loan that is the subject of this litigation. I have knowledge of how the files and documents pertaining to the servicing of mortgage loans, including the Subject Loan, are maintained and kept in the usual course of business. I am also familiar with PNC's entity history including its succession by merger to National City Bank. I have reviewed records regarding the securitization of the Subject Loan, the servicing relationship between the Defendants in this litigation with respect to the Subject Loan and the duties and obligations granted pursuant to such relationships."

Declarant Hiney stated: "I have personal knowledge of the facts set forth in this declaration and if called to testify thereto, I could and would do so competently and truthfully under oath. [¶] I currently hold the position of Quality Assurance Analyst for PNC. My duties as Quality Assurance Analyst include reviewing and validating current processes and procedures for Core Servicing and Default Management. From 04/2004 to 03/2010, I held the position of Compliance Specialist for PNC. During that time, I worked out of PNC's Miamisburg, Ohio offices in its Monetary and Investor Services department. As part of my duties as Compliance Specialist, I reviewed loans for compliance with disclosure requirements . . . . I am familiar with 15 USC section 1601 et seq., the Truth in Lending Act . . . and related regulations . . . and what constitutes compliance with the disclosure requirements under these laws. I am also familiar with loan documents as they are received and kept in the usual course of business at PNC. [¶] I have personally reviewed the documents in PNC's file relating to the loan that is the Subject of this action (Loan No. 4908454 ('Subject Loan'). . . . [¶] On November 30, 2009, I conducted a Brooks Audit of the Subject Loan. A Brooks Audit uses the loan terms including the loan amount, interest rate, rate changes, applicable indexes and closing costs to determine the APR, Finance Charges, Amount Financed and Total of Payments for the Subject Loan."

The gist of plaintiff's argument appears to be that both Arthur and Hiney, because they are employees of PNC, lacked personal knowledge, and therefore were not

9

competent to testify about the conduct and actions of the other defendants. But this is a straw man argument. Both Arthur and Hiney testified to actions taken by PNC, as those actions were reflected in the files and documentation held by PNC. Both Arthur and Hiney described their competence (Arthur as PNC's current "Assistant Vice President: in the "Mortgage Services, Default Division"; Hiney as PNC's "Quality Assurance Analyst" and former "Compliance Specialist") and familiarity with the contents of PNC's files they had reviewed. Both Arthur and Hiney established their personal knowledge of the matters to which they testified in their respective declarations. A large measure of the worth of those declarations was simply as the conveyor of documents from the files that had been examined. Arthur and Hiney were competent to perform the tasks of authenticating those documents and establishing their foundation.

Each stated the nature of their limited acquaintanceship with other defendants. Each opened their declaration by stating "I am an employee at PNC Bank, National Association, as successor by merger to National City Bank, formerly doing business as National City Mortgage . . . I am submitting this declaration in support of Defendants PNC BANK, N.A.; WELLS FARGO BANK, N.A., not in its individual or banking capacity, but solely as Master Servicer for GSAA Home Equity Trust 2007-4 and GSR Mortgage Loan Trust 2007-AR1; and DEUTSCHE BANK NATIONAL TRUST Co., in its capacity as trustee for GSAA Home Equity Trust 2007-4 and GSR Mortgage Loan Trust 2007-AR1 . . . ." Arthur further stated in effect that the notices of default and trustee sale were by Cal-Western Reconveyance Corporation, which "was acting as authorized foreclosure trustee on behalf of PNC and National City, PNC's predecessor, since the beginning of the foreclosure process to the foreclosure sale."

As for plaintiff's attack on the "self-serving" nature of the Arthur and Hiney declarations, "Modern courts have recognized that all evidence proffered by a party is intended to be self-serving in the sense of supporting the party's position, and it cannot be discounted on that basis." (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1050.) " 'If a statement with a self-serving aspect falls within an exception to the hearsay rule, . . . the declaration should be admitted despite its self-serving aspects' " (*ibid*.), and "it is

immaterial that such declarations are self-serving." (*Whitlow v. Durst* (1942) 20 Cal.2d 523, 524; see *Carson v. Facilities Development Co*. (1984) 36 Cal.3d 830, 851 ["The self-serving nature of the . . . hearsay statement does not preclude its admission"]; *Estate of Luke* (1987) 194 Cal.App.3d 1006, 1017 ["The fact the affidavit was self-serving did not make it inadmissible"].)  Although plaintiff 's objections are riddled with "Grounds for Objection:  Hearsay (Evid. Code section 1200)," an examination of the explanation provided by plaintiff appears to treat hearsay as synonymous with lack of foundation and personal knowledge.  However, as defendants correctly point out, plaintiff "does not make any arguments as to what parts of the declarations are hearsay or why they are hearsay."

There are several "The declaration is inadmissible to prove the content of a writing," which might be taken as a hearsay objection.  However, as may be gathered from their declarations, Arthur and Hiney were primarily being used as custodians of the documents attached to their declarations.  As defendants also point out, the documents constituted business records under Evidence Code section 1271, and thus did not constitute hearsay.

### The Matters Judicially Noticed

Plaintiff objected to eight of the 15 items defendants requested be judicially noticed, six of which were documents recorded in the Alameda County Recorder's Office.

"We review the trial court's ruling on the request for judicial notice for abuse of discretion.  [Citation.]  [¶] ' " 'Judicial notice is the recognition and acceptance by the court, for use by the trier of fact or by the court, of the existence of a matter of law or fact that is relevant to an issue in the action without requiring formal proof of the matter.' " ' (*Poseidon Development, Inc. v. Woodland Lane Estates, LLC* (2007) 152 Cal.App.4th 1106, 1117 (*Poseidon*).)  . . . Accordingly, Evidence Code section 452, subdivisions (c) and (h), respectively, permit a court, in its discretion, to take judicial notice of '[o]fficial acts . . . of any state of the United States' and '[f]acts and propositions that are not

11

reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy.'

"Pursuant to these provisions, courts have taken judicial notice of the existence and recordation of real property records, including deeds of trust, when the authenticity of the documents is not challenged.  [Citations.]  The official act of recordation and the common use of a notary public in the execution of such documents assure their reliability, and the maintenance of the documents in the recorder's office makes their existence and text capable of ready confirmation, thereby placing such documents beyond reasonable dispute.

"In addition, courts have taken judicial notice not only of the existence and recordation of recorded documents but also of a variety of matters that can be deduced from the documents.  In *Poseidon,* for example, the court affirmed the trial court's taking judicial notice, in sustaining a demurrer, of the parties, dates, and legal consequences of a series of recorded documents relating to a real estate transaction.  [Citation.]  Although the court recognized that it would have been improper to take judicial notice of the truth of statements of fact recited within the documents, the trial court was permitted to take judicial notice of the legal effect of the documents' language when that effect was clear. [Citation.]  Similarly, in *McElroy v. Chase Manhattan Mortgage Corp.* (2005) 134 Cal.App.4th 388, the court took judicial notice of the recordation of a notice of default under a deed of trust, the date of the notice's recording, and the amount stated as owing in the notice for the purpose of demonstrating the plaintiffs had notice of the amount claimed to be owing and the opportunity to cure a defective tender. . . .

"Strictly speaking, a court takes judicial notice of facts, not documents.  (Evid. Code, § 452, subds. (g), (h).)  When a court is asked to take judicial notice of a document, the propriety of the court's action depends upon the nature of the facts of which the court takes notice from the document. As noted in *Poseidon,* for example, it was proper for the trial court to take judicial notice of the dates, parties, and legally operative language of a series of recorded documents, but it would have been improper to take judicial notice of the truth of various factual representations made in the documents.  (*Poseidon, supra,*

12

152 Cal.App.4th at pp. 1117–1118; see similarly *Herrera v. Deutsche Bank National Trust Co.* (2011) 196 Cal.App.4th 1366, 1375.) Taken together, the decisions discussed above establish that a court may take judicial notice of the fact of a document's recordation, the date the document was recorded and executed, the parties to the transaction reflected in a recorded document, and the document's legally operative language, assuming there is no genuine dispute regarding the document's authenticity. From this, the court may deduce and rely upon the legal effect of the recorded document, when that effect is clear from its face." (*Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 264-265 (*Fontenot*); accord, Simons, Cal. Evidence Manual (2014 ed.) Judicial Notice, § 7:11, p. 543.) "Where, as here, judicial notice is requested of a *legally operative* document—like a contract [or documents recorded in connection with a real property transaction]—the court may take judicial notice not only of the fact of the document and its recording . . . but also facts that clearly derive from its *legal effect* . . . [if] the fact is not reasonably subject to dispute." (*Scott v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 754 (*Scott*); see *Jenkins v. JPMorgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 537 (*Jenkins*) [court "may take judicial notice of the parties, dates, and legal significance of recorded documents relating to a real estate transaction"].)

Plaintiff's attempts to demonstrate that the trial court abused its discretion in taking judicial notice as requested by defendants is not persuasive. His arguments do not implicate "genuine dispute regarding the document[s'] authenticity." (*Fontenot, supra*, 198 Cal.App.4th 256, 265.)

For example, as noted above, defendants asked for judicial notice of the notarized deed of trust between plaintiff and National City Mortgage, which was recorded on October 24, 2006. Plaintiff asked for—and was granted— judicial notice of the very same document. Yet plaintiff objected to the court taking judicial notice as requested by defendants. Why? Because, according to plaintiff, defendants' "version" of the deed of trust "is not a true and correct copy of the document that is recorded in Alameda County" in that defendants' version "has what appears to be handwritten as 'GS05EC 4908454'

13

and 'Zamora 0000' and '267'. . . marks" on it. Plaintiff does not specify any manner in which the notations contradicted anything on his version of the deed of trust or was otherwise likely to mislead.

Plaintiff also attacked defendants' version of the deed of trust as "inadmissible hearsay," one that "contain[s] information that is in dispute," and "cannot be authenticated." Again we ask: in what sense was defendants' version infected with hearsay but plaintiff's was not? What "information that is in dispute" differentiates the two versions? Plaintiff was in effect authenticating the deed of trust he was requesting the court to judicially notice. How or why was defendants' version any less equally authenticated? In other words, how was plaintiff's version authenticated but defendants' was not?

Finally, plaintiffs' version of the deed of trust was also attached to the "Assignment of [that same] Deed of Trust," recorded July 18, 2007, whereby National City Bank assigned its interest to E*Trade Bank. This too was judicially noticed as requested by plaintiff. Thus, plaintiff had two copies of the same document judicially noticed, but for which he saw insuperable obstacles when defendants asked for the same thing.

The other documents received less attention in plaintiff's opposition.

The sole objection to Exhibit B of defendant's request, a "Deed of Trust and Request for Notice of Default, also recorded on October 24, 2006, was that it was "inadmissible hearsay." Not a specific part or a particular recital in the document, but the entire document. *Fontenot* establishes that plaintiff's objection was overbroad. This reasoning also disposes of the same objection made to Exhibits C (Notice of Default, recorded May 4, 2009), D (Notice of Trustee's Sale, recorded August 25, 2009), E (Trustee's Deed Upon Sale, recorded March 29, 2010), and F (Substitution of Trustee, recorded July 6, 2010).

With respect to Exhibit C, a Notice of Default, plaintiff objected that the document "appears to be 'robo-signed,' " "the amount stated as being in default" was disputed, and incorrectly identifies "National City Mortgage, a division of National City Bank" as a

14

beneficiary. Even if true, none or all of these points would preclude judicial notice of the document in its entirety. Even if the amount was disputed, the document was still relevant to establish that plaintiff was aware of the existence of an outstanding debt and his nonpayment. (See *Jenkins*, *supra*, 216 Cal.App.4th 497, 537, citing *McElroy v. Chase Manhattan Mortgage Corp.* (2005) 134 Cal.App.4th 388, 394-395, *Scott*, *supra*, 214 Cal.App.4th 743, 754.)

Exhibit D, the Notice of Trustee's Sale, was challenged by plaintiff because it: (1) was "robo-signed"; (2) was based on a disputed figure; (3) may have been executed on a date other than recorded on the document; and (4) "is different on its face because than the Notice of Trustee sale that was put on Plaintiff's door in 2009." All of these points are covered by the reasoning in the preceding paragraph.[5]

Plaintiff objected to Exhibit E, the Trustee's Deed Upon Sale, "because it was created by Co-Defendant Cal-Western Reconveyance Corp.," which plaintiff "disputes . . . was the legal trustee with the 'power of sale' under the disputed DOT [deed of trust]." And plaintiff asserted that Exhibit F, a Substitution of Trustee, "is disputed because Plaintiff asserts that NCM [National City Mortgage] was not the legal beneficiary with the authority to initiate the substitution." But Exhibit F reflected the substitution of Cal-Western Reconveyance Corporation for National City *Bank* as *trustee*. None of this

---

[5] Unlike what he did with Exhibit A, plaintiff did not ask the court to judicially notice the differing version of the document. Instead, plaintiff said his version was in a different part of his opposition paper—"See Exhibit T—Non-executed 'Robo-Signed' Notice of Trustee Sale, attached to the Declaration of Steven J. Zamora." But if the court went to plaintiff's declaration, and sought out Exhibit T, the court would have found a Farmers Insurance Group document headed "Evidence of Insurance for Mortgage/Other Interests." Only by digging through the 26 exhibits comprising more than 200 pageswould the court ascertain that plaintiff probably meant Exhibit R, which has no signature, much less a "robo-signed" one. This was another instance of plaintiff putting before the court the same document he objected to defendants producing.

We also note that the court was required to go through the 224 pages of the 480 allegedly undisputed facts of defendants' hugely redundant separate statement, together with plaintiff's lengthy and repetitious responses, let alone the supporting evidence . The court was also compelled to rule on the parties' evidentiary objections, which required 25 pages in two separate orders.

15

amounts to a dispute as to the genuineness of the documents.  (*Fontenot, supra*, 198 Cal.App.4th 256, 265.)

Finally, as plaintiff put it in his opposition:  "Exhibit N—History of PNC Bank, National Association (FDIC Cert.6384) and Exhibit O—Official certification of the Office of the Comptroller of the Currency are hearsay, have no foundation of the controversy at issue and have no legal bearing on this case whatsoever.  Exhibits N and O do not contain any reference to the subject DOT [deed of trust], Loan or Property.  They cannot be used in place of a proper assignment of the DOT for the subject Property, or any beneficial interest in the subject Loan, or as a shortcut to circumvent statutory procedure regarding non-judicial foreclosure.  Exhibits N and O are simply irrelevant to the Subject Loan and Property."

This court recently noted that "we know of no 'official Web site' provision for judicial notice in California."  (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 889.)  We observed that " 'Simply because information is on the Internet does not mean that it is not reasonably subject to dispute,' " and therefore inappropriate for judicial notice.  (*Ibid*.; accord, *Scott*, *supra*, 214 Cal.App.4th 742, 760-761.)  But we did not categorically preclude recognition of Web site material, particularly a governmental Web site, when there was no genuine dispute concerning the material's authenticity or completeness.  (See *Jolley v. Chase Home Finance, LLC*, *supra*, at pp. 886-891 [trial court should not have judicially noticed agreement whereby assets of defunct financial institution were acquired from FDIC, when serious doubt existed as to completeness of the version of agreement downloaded from FDIC Web site].)  But here, plaintiff did not claim the exhibits were inauthentic or involved a disputed matter.  As they were in effect public documents and "not reasonably subject to dispute," judicial notice could be taken.  (Evid. Code, § 452, subds. (c), (h); *People v. Kelly* (2013) 215 Cal.App.4th 297, 304, fn. 4 [download from governmental website]; *Scott*, *supra*, 214 Cal.App.4th 743, 755, fn. 3 [same].)

In short, and in conclusion, our review establishes that plaintiff does not identify a genuine dispute regarding the authenticity of any of the challenged documents.  (*Jenkins*,

16

*supra*, 216 Cal.App.4th 497, 537; *Scott, supra*, 214 Cal.App.4th 743, 754; *Fontenot, supra*, 198 Cal.App.4th 256, 265.)

## The Summary Adjudication Order

## Standards of Review

The standard of review following entry of summary judgment is well established. In *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 253-254, we summarized it as follows:

"Code of Civil Procedure section 437c, subdivision (c) provides that summary judgment is properly granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. [Citation.] As applicable here, moving defendants can meet their burden by demonstrating that 'a cause of action has no merit,' which they can do by showing that '[o]ne or more elements of the cause of action cannot be separately established . . . .' [Citations.] Once defendants meet this burden, the burden shifts to plaintiff to show the existence of a triable issue of material fact. [Citation.]

"On appeal '[w]e review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. [Citations.]' [Citation.] Put another way, we exercise our independent judgment, and decide whether undisputed facts have been established that negate plaintiff's claims. [Citation.] As we put it in *Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 320: '[W]e exercise an independent review to determine if the defendant moving for summary judgment met its burden of establishing a complete defense or of negating each of the plaintiff's theories and establishing that the action was without merit.' [Citation.]

"But other principles guide us as well, including that '[w]e accept as true the facts . . . in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them.' (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67.) And we must ' "view the evidence in the light most favorable to . . . the losing part[y]" and "liberally construe [his] evidentiary submissions

17

and strictly scrutinize [the moving party's] own evidence, in order to resolve any evidentiary doubts or ambiguities in [the losing party's] favor." ' (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 96–97.)"

### The Cause of Action For Wrongful Foreclosure

Plaintiff borrowed the purchase money in two loans from National City Mortgage. National City Mortgage was a division of National City Bank. The notarized deed of trust and request for notice of default signed by plaintiff at the time of the loans identified National City Mortgage as a division of National City Bank as both "trustee" and "beneficiary." Cal-Western Reconveyance Corporation's substitution as trustee in place of National City Mortgage was executed on May 1, 2009, [6] three days prior to Cal-Western causing the notice of default and election to sell under deed of trust to be recorded on May 4, 2009. Cal-Western described itself as "duly appointed trustee" in the notice of trustee's sale it had recorded on August 25, 2009 and the "Substituted Trustee" in the Trustee's Deed Upon Sale reporting transfer of the property to RWW Properties, LLC that was recorded on March 29, 2010.

This paper trail does not reflect two things that plaintiff sees as fundamental. First, that the loans were sold by National City Mortgage to Goldman Sachs sometime in 2007, that the loans were then, to quote Mr. Arthur, "securitized by Goldman and became part of a loan pool . . . for which Deutsche Bank National Trust Co. served as trustee." Further quoting Mr. Arthur, "Since November 2009, PNC has been the servicer of the Subject Loan acting on behalf of Deutsche Bank National Trust Co. and initiating and completing the foreclosure" because "PNC also had a power to act on behalf of Deutsche Bank National Trust Co. as servicer of loans." Second, that in November 2009 National

---

[6] However, it does not appear that plaintiff was formally given notice of the substitution until July 2009, which is when the substitution became effective upon being recorded. (See Civ. Code, § 2934a, subds. (a)(1), (a)(2), (a)(2)(D).) At that point, the document of substitution "shall constitute conclusive evidence . . . in favor of substituted trustees acting pursuant to this section, subsequent assignees of the obligations secured by the deed of trust, and subsequent bona fide purchasers or encumbrancers for value of the property described therein." (*Id.*, subd. (a)(2)(D).)

City Bank (and by extension its National City Mortgage) was acquired and merged into PNC. Thus, to plaintiff, when National City Mortgage sold the loans to Goldman Sachs, it no longer qualified as a trustee or beneficiary under the loan documents, and therefore could not substitute Cal-Western in its place. And even if PNC had a power to act on behalf of Deutsche Bank National Trust Co. as servicer of loans, PNC's name never appeared on any of the foreclosure documents, and there is nothing designating Cal-Western to act on its behalf. So, as plaintiff sees it, the foreclosure sale was prosecuted in the name of a former agent on behalf of an extinct principal.

Plaintiff's reasoning obviously applies to reviving his cause of action for wrongful foreclosure, but it also underlies most of the other causes of action he wants to have vindicated on this appeal. For this reason it is helpful to begin with a summary of the law governing nonjudicial foreclosure, as provided in a recent opinion:

The power of sale in a deed of trust allows a beneficiary recourse to the security without the necessity of a judicial action. (See *Melendrez v. D & I Investment, Inc.* (2005) 127 Cal.App.4th 1238, 1249.) Absent any evidence to the contrary, a nonjudicial foreclosure sale is presumed to have been conducted regularly and fairly. (Civ.Code, § 2924.) However, irregularities in a nonjudicial trustee's sale may be grounds for setting it aside if they are prejudicial to the party challenging the sale. (See *Lo v. Jensen* (2001) 88 Cal.App.4th 1093, 1097–1098; see also *Angell v. Superior Court* (1999) 73 Cal.App.4th 691, 700 [" 'In order to challenge the sale successfully there must be evidence of a failure to comply with the procedural requirements for the foreclosure sale that caused prejudice to the person attacking the sale.' "].) Setting aside a nonjudicial foreclosure sale is an equitable remedy. (*Lo v. Jensen, supra,* 88 Cal.App.4th at p. 1098, 106 Cal.Rptr.2d 443 ["A debtor may apply to a court of equity to set aside a trust deed foreclosure on allegations of unfairness or irregularity that, coupled with the inadequacy of price obtained at the sale, mean that it is appropriate to invalidate the sale."].) A court will not grant equitable relief to a plaintiff unless the plaintiff does equity. (See *Arnolds Management Corp. v. Eischen* (1984) 158 Cal.App.3d 575, 578–579; see also 13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 6, pp. 286–287.) Thus, "[i]t is settled

19

that an action to set aside a trustee's sale for irregularities in sale notice or procedure should be accompanied by an offer to pay the full amount of the debt for which the property was security." (*Arnolds Management Corp. v. Eischen, supra,* 158 Cal.App.3d at p. 578; see also *FPCI RE–HAB 01 v. E&G Investments, Ltd.* (1989) 207 Cal.App.3d 1018, 1022 [rationale behind tender rule is that irregularities in foreclosure sale do not damage plaintiff where plaintiff could not redeem property had sale procedures been proper].)

Although the identity of the beneficiary is important, knowledge of the trustee is far more significant:  "A party who is not the trustee of record will not have the authority to conduct the foreclosure or deliver a valid trustee's deed."  (Bernhardt, *supra*, § 2.25, p. 2-31.)  "Only the trustee of record has the legal authority to convey title to the successful bidder after a nonjudicial foreclosure."  (*Id.*, § 2.98, p. 2-111.)  "Former trustees . . . who are not the properly appointed and serving trustee [citation] at the time of the [sale] will be unable to convey title and the sale will be 'void' and not just 'voidable.' "  (*Id.*, § 12.91, p. 12-127, citing *Dimock v. Emerald Properties* (2000) 81 Cal.App.4th 868.)

Plaintiff cites *Dimock* in his brief for the proposition that a trustee's sale that does not conform to statutory requirements is void.  However, an examination of the prayer to plaintiff's complaint leaves some doubt whether he truly wants to be restored to the property.

Plaintiff did name RWW Properties LLC—who purchased the property at the trustee's sale—as a party, and did seek judicial declarations that the "foreclosure proceedings . . . was not administered properly in compliance with California Civil Code 2924 et seq. and that the procedural defects deem the sale void," and therefore "that title to the subject Property is vested in Plaintiff Steven J. Zamora alone."  Plaintiff prayed for $500,000 as civil penalties under the Business and Professions Code statutes, and also, under those statutes, for "full restitution . . . of all monies paid."  Alternatively, plaintiff wanted the court to "order disgorgement . . . through its equitable powers . . . for all monies received by Defendants in conjunction with Plaintiff's loan . . ., not less than

20

$7,000,000." Plus, plaintiff wanted "Defendants to return the monies and assets derived from the original Note, equal to the value of $700,000." Plaintiff also stated a cause of action to rescind his loan obligation, in which he alleged that the service of his complaint constituted his "offer to restore the benefits received under the contract," as allowed by Civil Code section 1691.

But plaintiff cannot get back the property, the value of the indebtedness he incurred but never paid, civil penalties, and punitive damages. That type of multiple recovery is restricted to a very limited number of public contracts. (See *Thomson v. Call* (1985) 38 Cal.3d 633, [violation of statute prohibiting public officials from participating in decisions in which they have a disqualifying financial interest allows public entity to retain benefit of contract and get return of any monies paid for that benefit].)

Nevertheless, plaintiff is justified in pointing to defendants' overreliance on recorded documents (see *Herrera v. Deutsche Bank National Trust Co.*, *supra*, 196 Cal.App.4th 1366), and it hardly inspires confidence that defendants are unable to provide information such as the precise date on which the loan was acquired by Goldman Sachs.[7] Still, these failings will not benefit plaintiff.

Plaintiff is correct that Cal-Western's written substitution for National City Bank was not recorded until July 6, 2009, after the notice of default had been recorded, by Cal-Western, on May 4, 2009. But the language of the notice of default and election to sell under deed of trust accompanying the notice of default recites that Cal-Western "is either the original trustee, the duly appointed substituted trustee, or *acting as agent for the trustee*." (Italics added.) Such delegation is expressly authorized by California law. (See Civ. Code, § 2924, subd. (a)(1) [notice of default may be filed by the "trustee, mortgagee, or beneficiary, or *any of their authorized agents*," italics added].)

---

[7] On the other hand, "[b]ecause a promissory note is a negotiable instrument, a borrower must anticipate it can and might be transferred to another creditor. As to [the borrower], an assignment merely substituted one creditor for another." (*Herrera v. Federal National Mortgage Assn.* (2012) 205 Cal.App.4th 1495, 1507; accord, *Jenkins*, *supra*, 216 Cal.App.4th 497, 515.) As a licensed real estate broker, plaintiff would be expected to be aware of this likelihood.

21

As shown above, Cal-Western had been named the substitute in a document dated May 1, 2009, three days before the notice of default was recorded. Although the substitution as trustee could not be unchallengeable until recorded, it could still be effective. (See Civ. Code, § 2934a, subds. (a)(2) [" A substitution . . . is not effective unless all the parties" have executed a specified statement] & (a)(2)(D), quoted at fn. 5, *ante*.) Alternatively, there is no reason Cal-Western could not have submitted the Notice of Default for recording while "*acting as agent for the trustee*," namely, National City Bank. This is a reasonable inference from defendants' evidence, including the judicially noticed materials, no matter how narrowly construed. (Code Civ. Proc., § 437c, subd. (c); *Jenkins*, *supra*, 216 Cal.App.4th 497, 515-516.) Moreover, the authorities quoted establish that the dispositive recorded documents are the notice of trustee's sale (recorded August 25, 2009) and the trustee's deed upon sale (recorded March 29, 2010), and both of those events occurred after Cal-Western's substitution was recorded and became "conclusive." (Civ. Code, § 2934a, subd. (a)(2)(D).)

Attention should also be paid to plaintiff's actual, personal knowledge. In early October 2009, he was sent a letter on National City mortgage letterhead which advised: "Dear STEVEN J ZAMORA  [¶] INFORMATION ABOUT YOUR MORTGAGE LOAN  [¶] Welcome to the PNC Bank family. We are proud and excited to let you know that National City Mortgage, a division of National City Bank, has become part of PNC. As a result of this union, we will be changing our company name. Effective November 7, 2009, our new legal entity name will be:  PNC Mortgage, a division of PNC Bank . . . . This does not change the servicing of your loan, your loan number, or where you send your payments.  [¶] . . . [¶] . . . **Effective November 7, 2009, please make your checks payable to PNC Mortgage** . . . ."

Plaintiff is not someone unfamiliar to the world of real estate-based obligations. Quite the contrary. It is undisputed that he has been a licensed real estate broker since 2004, and that he "studied mortgages as part of obtaining that license." And yet, even with knowledge of the notice of default, and even after receiving the quoted letter, he never communicated with PNC after receiving the notice of trustee's sale. PNC twice

22

postponed the sale while waiting for plaintiff to produce, in Mr. Arthur's words, "financials . . . for a potential loan modification review."  In fact, it seems that plaintiff's first concrete response to the letter—indeed, the entire controversy—was to commence this action in December 2009 and unsuccessfully attempt to halt the foreclosure sale.

"To obtain the equitable set-aside of a trustee's sale or maintain a wrongful foreclosure claim," a plaintiff must allege and prove, among other things, that "the defendants caused an illegal, fraudulent, or willfully oppressive sale of the property pursuant to a power of sale in a . . . deed of trust," and "the plaintiff suffered prejudice or harm."  (*Chavez v. Indymac Mortgage Services* (2013) 219 Cal.App.4th 1052, 1062.)  Although plaintiff undoubtedly views himself as the harmed victim of an illegal sale  (see *West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 800 [illegal, fraudulent, or willfully oppressive sale shown if "the trustee or beneficiary failed to comply with the statutory requirements for the notice or conduct of the sale"]), the evidence shows otherwise.

The third element of the cause of action is "the plaintiff tendered the amount of the secured indebtedness or was excused from tendering."  (*Chavez v. Indymac Mortgage Services*, *supra*, 219 Cal.App.4th 1052, 1062.)  Although plaintiff may be excused from the tender requirement by Civil Code section 1691 with respect to alleging a cause of action for rescission, the excuse does not extend to wrongful foreclosure:  "Recognized exceptions to the tender rule include when (1) the underlying debt is void, (2) the foreclosure sale or trustee's deed is void on its face, (3) a counterclaim offsets the amount due, (4) specific circumstances make it inequitable to enforce the debt against the party challenging the sale, or (5) the foreclosure sale has not yet occurred."  (*Chavez v. Indymac Mortgage Services*, *supra*, 219 Cal.App.4th at p. 1062.)  The only one of these exceptions that might apply is the first, because plaintiff does maintain that the debt is void by reason of fraud in the form of intentional misrepresentation.  But even this will not excuse tender if the plaintiff is seeking to set aside the trustee's sale:  "Because the action is in equity, a defaulted borrower who seeks to set aside a trustee's sale is required to do equity before the court will exercise its equitable powers.  [Citation.]

Consequently, as a condition precedent to an action by the borrower to set aside the trustee's sale on the ground that the sale is voidable because of irregularities in the sale notice or procedure, the borrower must offer to pay the full amount of the debt for which the property was security. [Citations.] 'The rationale behind the rule is that if [the borrower] could not have redeemed the property had the sale procedures been proper, any irregularities in the sale did not result in damages to the [borrower].' [Citation.]" (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 112; see *Pfeifer v. Countrywide Home Loans, Inc.* (2012) 211 Cal.App.4th 1250, 1280-1281 [tender requirement applies to any action seeking to set aside a foreclosure sale].) In other words, the plaintiff should not get the windfall of the property without paying for it. (See *Stebley v. Litton Loan Servicing, LLP* (2011) 202 Cal.App.4th 522, 526.)

" 'The doctrine of tender has been correctly summarized in this fashion: "The rules which govern tenders are strict and are strictly applied, and where the rules are prescribed by statute or rules of court, the tender must be in such form as to comply therewith. The tenderer must do and offer everything that is necessary on his part to complete the transaction, and must fairly make known his purpose without ambiguity, and the act of tender must be such that it needs only acceptance by the one to whom it is made to complete the transaction." ' [Citations.] In other words, with respect to tender, "it is a debtor's responsibility to make an unambiguous tender of the entire amount due or else suffer the consequence that the tender is of no effect." ' " (*Nguyen v. Calhoun* (2003) 105 Cal.App.4th 428, 439, quoting *Gaffney v. Downey Savings & Loan Assn.* (1988) 200 Cal.App.3d 1154, 1165.)

Apart from his own "self-serving" deposition testimony that he offered to pay what he thought was the amount owed, plaintiff presented no evidence that he offered to pay the full amount of the debt. Plaintiff conceded that he "produced no evidence of his financial condition or ability to make a tender" of even the smaller amount that he thought was owing. In other words, even if defendants were of a mind to accept plaintiff's numbers, he did not stand ready to pay that sum at once. In consequence, plaintiff's tender cannot be accepted as "sufficient" (*Py v. Pleitner* (1945) 70 Cal.App.2d

24

576, 581), or "viable" (*Karlsen v. American Sav. & Loan Assn.* (1971) 15 Cal.App.3d 112, 117), or "effective" (*id*. at p. 121) enough to satisfy the requirement. (See Civ. Code, §§ 1486 ["An offer of partial performance is of no effect."], 1495 ["An offer of performance is of no effect if the person making it is not able . . . to perform according to the offer."]; *Gaffney v. Downey Savings & Loan Assn., supra*, 200 Cal.App.3d 1154, 1165 [" '[n]othing short of the full amount due the creditor is sufficient to constitute a valid tender, and the debtor must at his peril offer the full amount,*' " italics added]; *United States Cold Storage v. Great Western Savings & Loan Assn.* (1985) 165 Cal.App.3d 1214, 1222 ["the law is long-established that a trustor . . . must tender the obligation *in full* as a perquisite to challenge of the foreclosure sale," italics added; original italics omitted]; *Arnolds Management Corp. v. Escher* (1984) 158 Cal.App.3d 575, 578 [tender must be "an offer to pay *the full amount of the debt* for which the property was security," italics added]; *Karlsen v. American Sav. & Loan Assn., supra*, at p. 118 ["Simply put, if the offeror '. . . is without the money necessary to make the offer good and knows it . . .' the tender is without legal force or effect."].)

Summary adjudication in defendants' favor was thus proper for each and all of these reasons.

The tender rule will also figure in the rapid disposition of other of plaintiff's causes of action.

### The Cause Of Action To Quiet Title

The two elements of the ordinary cause of action to quiet title are "the plaintiff is the owner and in possession of the land and that the defendant claims an interest therein adverse to him." (*South Shore Land Co. v. Petersen* (1964) 226 Cal.App.2d 725, 740-741, citing *Lucas v. Sweet* (1956) 47 Cal.2d 20, 22 and *Ephraim v. Metropolitan Trust* Co. (1946) 28 Cal.2d 824, 833.) "A borrower may not . . . quiet title against a secured lender without first paying the outstanding debt on which the . . . deed of trust is based." (*Lueras v. BAC Homes Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 86; accord, *Shimpones v. Stickney* (1934) 219 Cal. 637, 649.) It is undisputed that following the trustee's sale, plaintiff is no longer the owner or in possession of the property. As

established in the preceding discussion, it is further undisputed that plaintiff did not pay off the loans, or even make a sufficient tender of payment.

Thus, summary adjudication in defendants' favor was proper.

### The Cause Of Action For Declaratory Relief

The status of the property is the heart of plaintiff's cause of action for declaratory relief. He alleged that "the foreclosure proceedings in relation to Plaintiff's PROPERTY is <u>void</u>," with the consequence that "Plaintiff has sole legal title to said PROPERTY." Declaratory relief is an equitable remedy (*City of L. A. v. City of Glendale* (1943) 23 Cal.2d 68, 81; *Hartley v. Superior Court* (2011) 196 Cal.App.4th 1249, 1258), and it is therefore subject to the equitable principle behind the tender requirement. (*Lona v. Citibank, N.A.*, *supra*, 202 Cal.App.4th 89, 112, quoted *ante*.) A number of reported decisions have linked the availability of declaratory relief in a foreclosure challenge to satisfying the tender requirement. (*Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1109 [tender requirement applies to "any cause of action for irregularity in the sale procedure"]; *McElroy v. Chase Manhattan Mortgage Corp.*, *supra*, 2005) 134 Cal.App.4th 388, 394.) In the absence of a sufficient tender by plaintiff, summary adjudication on this cause of action was properly granted to defendants.

### The Cause Of Action For Rescission

Part of plaintiff's cause of declaratory relief also overlaps his rescission cause of action (entitled "Restitution, Rescission Based on Illegality, Fraud, and Deceit"). As part of the former, plaintiff alleged that he "<u>rescinded</u> the LOAN on August 1, 2009, . . . therefore abolishing any legal or lawful validity of the DEED and Plaintiff has sole legal custody to said PROPERTY." He further prayed for declaratory relief to his contention that "the monies derived from the transactions relating to Plaintiff's account, LOAN, NOTE, PROPERTY and DEED, including but not limited to upfront payments and successive monies paid and received by Defendants in conjunction are due to Plaintiff."

Plaintiff's effort to rescind the loan agreement and recover the sums paid thereunder is another instance of seeking equitable relief. (*Farrar v. Steenburgh* (1916) 173 Cal. 94, 97 ["It is distinctly a cause of action in equity to rescind a contract of sale,

26

cancel a note and mortgage, and recover the consideration paid"]; *Tullis v. Title Guarantee etc. Co*. (1936) 11 Cal.App.2d 391, 393; *Fair View Farms Co. v. Superior Court* (1932) 123 Cal.App. 9, 10-11.) It is therefore subject to the tender requirement: "The right to rescind is conditional upon the party who rescinds restoring everything of value which he has received in the transaction." (*Loud v. Luse* (1931) 214 Cal. 10, 12.) "The rule applies although the plaintiff was induced to enter into the contract by the fraudulent representations of the defendant." (*Fleming v. Kagan* (1961) 189 Cal.App.2d 791-796-797, citing *Henry v. Philips* (1912) 163 Cal. 135, 143, 146.)[8]

Again, summary adjudication was proper.

### The Cause of Action for Unjust Enrichment

In his cause of action for "Restitution (Unjust Enrichment), plaintiff alleged that he "overpaid interest, paid excessive fees and unjustified markups" to defendants "based on improper, inaccurate and fraudulent misrepresentations," and defendants have "failed to return" the "monies and benefits received from PLAINTIFF'S assets." "Restitution" and "unjust enrichment" are synonyms, both expressing a principle of equity, and both requiring tender. (*County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 542; *Dunkin v. Boskey* (2000) 82 Cal.App.4th 171, 198; see *California Federal Bank v.*

---

[8] Mention has already been made of plaintiff's reliance on the language in Civil Code section 1691, subdivision (b) that "When notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both." Although the point has never been authoritatively addressed, we think it plain that the purpose of this language is confined to the realm of pleading, relieving the plaintiff of the burden of including allegations that offer was made and refused. Any other construction, especially one giving the language a substantive evidentiary effect would produce the absurd result of relieving the plaintiff of having to prove that tender was or could be made in a form sufficient "to restore the benefits received." (See Note, *Statutory Changes in the Law of Rescission in California* (1968) 19 Hastings L. Journal 1248, 1255-1256 [courts retain "the power to protect the defendant by making the judgment conditional upon the plaintiff's restoring the consideration."]; cf. *Dunger v. Whitney* (1928) 92 Cal.App. 216, 223 ["a mere allegation in the pleadings cannot be held sufficient to take the place of the necessary offer to restore possession."].)

27

*Matreyek* (1992) 8 Cal.App.4th 125, 134 ["A party seeking restitution 'must generally return any benefit' that it has received."]; *Johansen v. Pelton* (1970) 8 Cal.App.3d 625, 633 ["The remedy of restitution is an equitable one"].)  Summary adjudication was proper.

### The Cause of Action for Intentional Misrepresentation

The gist of plaintiff's cause of action is that he was fraudulently induced to execute the loan documents because of inaccurate statements about the terms, in essence a claim of promissory fraud.  " 'Promissory fraud" is a subspecies of the action of fraud . . . .  A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud.  [Citations.]  [¶] An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)  The elements for this claim are:  (1) a misrepresentation; (2) by an individual with knowledge of its falsity and; (3) the intent to induce reliance on the misrepresentation; (4) that does induce actual and justifiable reliance; and (5) which results in damage.  (*Ibid*.)  "In California, fraud must be pled specifically; general and conclusory allegations do not suffice.  [Citations.]  'Thus " 'the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect.' "  [Citation.]  [¶] This particularity requirement necessitates pleading *facts* which show how, when, where, to whom, and by what means the representations were tendered.'  [Citation.]  A plaintiff's burden in asserting a fraud claim against a corporate employer is even greater.  In such a case, the plaintiff must 'allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.'  [Citation.]" (*Id*. at p. 645.)

True, these are pleading requirements, and this is not a pleading issue.  This is not one of the causes of action that fell to defendants' general demurrer, and defendant's have thus accepted the adequacy of plaintiff's allegations.  Nevertheless, the pleading requirements correspond to the heavy and elaborate evidentiary burdens of proving fraud.

28

For present purposes, we are concerned with the converse of that proposition, that is, how many points of vulnerability there are in a fraud claim, and only one need succeed for the claim to fail to a summary adjudication motion.

To begin with, we repeat what we said only last year: "We acknowledge that we deal with an ordinary duty of reasonable care, not a fiduciary duty. [Citations.] And we [further] acknowledge that '[a]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed its conventional role as a mere lender of money.' [Citations.]" (*Jolley v. Chase Home Finance, LLC*, *supra*, 213 Cal.App.4th 872, 898.) Among the authorities we cited was *Oaks Management Corp. v. Superior Court* (2006) 145 Cal.App.4th 453, 466, where the Court of Appeal stated: "[A]bsent special circumstances . . . a loan transaction is at arms-length and there is no fiduciary relationship."

There are no special circumstances here. Plaintiff was not an innocent gullible, but a licensed professional in the area of real estate finance. He is also the owner of other properties, and had experience in this field prior to negotiating the loan with National City. Moreover, plaintiff did not negotiate directly with National City, but engaged a mortgage broker, Platinum Group Funding, and it was Platinum Group Funding who presumably dealt with National City.

As previously mentioned, the trial court's order included the following, only this time we reproduce the supporting evidence cited: "The only discussions Plaintiff had about the Subject Loan terms prior to closing were with his mortgage broker, Platinum Group Funding. [**Exhibit H to Bryan Decl.—Deposition of Plaintiff, Vol. I at pp. 53:11—58:1 and 91:11—91:15**.] Plaintiff believed he would receive an adjustable rate loan, at a 6.5% interest rate (not a 6.5% Annual Percentage Rate which treats certain fees as interest), which the initial monthly payment of $3,791.67, which would adjust after five years based upon the applicable index. [**Exhibit H to Bryan Decl.—Deposition of Plaintiff, Vol. I at pp. 85:19--88:8, 102:20—103:25 and 105.2—105:25; Exhibit H to Bryan Decl.—Deposition of Plaintiff, Vol. I, at Exhibit F (Loan Application)**.] Plaintiff did not discuss the amount financed, finance charge or total

29

payments with Platinum Group Funding prior to closing.  [**Exhibit H to Bryan Decl.— Deposition of Plaintiff, Vol. I at pp. 85:19-—88:8, 105:2—105:25.**]  Plaintiff understood that his initial monthly interest-only payment would be $3,791.67 for the first five years of the repayment period and that he would have an APR (not an interest rate) of 7.53%.  [**Exhibit H to Bryan Decl.—Deposition of Plaintiff, Vol. I at pp. 86:18— 87:9**.]  The signed TILA Disclosure has a facsimile transmission date within five days of the closing in October 2006.  [**Exhibit H to RJN [defendant's request for judicial notice]—Plaintiff's TAC [third amended complaint], at Exhibits A and B to TAC . . . .**]  There is an unsigned non-final TILA Disclosure which also sets forth a monthly payment total of $3,791.67.  [ **. . . Exhibit H to RJN—Plaintiff's TAC, at Exhibit B**.]  A comparison of the signed 'final' TILA with the HUD-1 form which Plaintiff admits was correct, reflects that the signed TILA actually overdisclosed finance charges.  [**. . . Exhibit H to RJN—Plaintiff's TAC, at Exhibits A and C**.]"

Plaintiff's opposition to these undisputed facts identified by defendants consisted solely of the declaration he prepared to oppose the summary adjudication motion.   This situation constitutes an exception to the rule of liberal construction to the party opposing summary adjudication:

"In *D'Amico* [ *v. Board of Medical Examiners* (1974) 11 Cal.3d 1], the California Supreme Court declared that '[w]here a plaintiff's admissions in a deposition *contradict statements in the plaintiff's affidavits opposing the summary judgment,* "the rule of liberal construction loses its efficacy and the granting or denial of the motion for summary judgment depends upon the issues of credibility.  Accordingly, when a defendant can establish his defense with the plaintiff's admissions sufficient to pass the strict construction test imposed on the moving party . . . , the credibility of the admissions are valued so highly that the *controverting affidavits* may be disregarded as irrelevant, inadmissible or evasive." '  [Citations.]  [¶] Properly applied, *D'Amico* is limited to instances where 'credible [discovery] admissions . . . [are] contradicted *only* by self-serving declarations of a party.' [Citations.]"  (*Scalf v. D.B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1521–1522.)

Moreover, exhibits attached to a complaint become part of that pleading. (*Stoops v. Abbassi* (2002) 100 Cal.App.4th 644, 650.) Particularly when the pleading is, as here, verified, the pleader is bound by what is in the exhibits, which can constitute evidence in support of the opposing parties' summary adjudication motion. (*Parker v. Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 181; *24 Hour Fitness, Inc v. Superior Court* (1998) 66 Cal.App.4th 1199, 1211 ["Although a party cannot rely on its own pleadings on summary judgment, a party seeking or opposing summary judgment . . . can rely on admissions of material fact made in the *opposing* party's pleadings."]; *Addy v. Bliss & Glennon* (1996) 44 Cal.App.4th 205, 218 [" ' "A judicial admission in a pleading . . . is a conclusive concession of the truth of a matter which has the effect or removing it from the issues" ' "]; *Brecher v. Gleason* (1972) 27 Cal.App.3d 496, 499, fn. 1 ["A verified assertion in a pleading is a conclusive concession of the truth of the matter pleaded"]; *Walker v. Dorn* (1966) 240 Cal.App.2d 118, 120 [" 'no judicial admission results . . . unless they involve contradictions of fact in a verified pleading' "]; 4 Witkin, Cal. Procedure, *supra*, Pleading, § 454, p. 587 ["The admission of a fact in a pleading is conclusive on the pleader. The pleader cannot offer contrary evidence . . . and a judgment may rest in whole or in part on the admission"].)

In other words, because plaintiff cannot look to his own "self-serving" declaration, he is deemed to have failed to produce any evidence in opposition to defendants' motion. Moreover, plaintiff had no evidence to challenge the recitals in the exhibits he attached to his third amended complaint. The consequence is that plaintiff, who personally dealt only with Platinum Group Funding, had no evidence of specific misrepresentations to him by specific employees of any defendant. The unavoidable conclusion from the trial court's individual determinations is that plaintiff got the loan with the terms he told Platinum Group Funding he wanted. This conclusion is fortified by plaintiff's subsequent conduct—paying without complaint the monthly payment specified in the loan documents for almost two years. " 'The conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions. [Citations.]' [Citation.] Thus, courts will adopt and

31

enforce the parties' practical construction when reasonable." (*Hernandez v. Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1814.) This reasoning is particularly apt in light of plaintiff's personal familiarity and professional competence in this subject.

Because plaintiff thus had no viable cause of action for intentional misrepresentation, summary adjudication was proper.

## The Causes of Action For Violation of the
## Business and Professions Code

Section 17200 of the Business and Professions Code defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) . . . ." Section 17500 in turn prohibits "any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property" from making or disseminating "any statement concerning that real or personal property . . . which is untrue or misleading . . . ." Relief under these provisions is generally limited to injunctive relief and restitution. (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 371 [statutory remedies "are narrow in scope," " 'generally limited to injunctive relief and restitution,' " and do not include compensatory damages or attorney fees].) Plaintiff did not seek injunctive relief, and it has already been shown that he has no claim for restitution. But civil penalties of $2,500 "for each violation" are statutorily authorized. (Bus. & Profs. Code, §§ 17206, subd. (a), 17536, subd. (a).) These plaintiff did seek. There are two reasons why plaintiff cannot recover these penalties.

First, as applied to federally-chartered banking institutions—in other words, each of the defendants here—California's statutory scheme is preempted by federal law. (See *Silvas v. E\*Trade Mortgage Corp.* (9th Cir. 2008) 514 F.3d 1001, 1006-1007; *Vega v. JPMorgan Chase Bank, N.A.* (E. D. Cal. 2009) 654 F.Supp.2d 1104, 1117-1118 and authorities cited.) Second, as already shown, plaintiff failed to establish that defendants face liability for any unfair, untrue, fraudulent, or misleading statement or practice. There is consequently no basis for assessing the civil penalties allowed for by

32

section 17206 and 17536. Thus, summary adjudication was proper as to plaintiff's first and second causes of action.

### The Cause of Action for Civil Conspiracy

All of plaintiff's causes of action seeking to impose substantive or monetary liability on defendants have been shown to be unsound. Plaintiff's final cause of action for civil conspiracy, which has no independent potential for liability, consequently also fails. (*Chavers v. Gatke Corp.* (2003) 107 Cal.App.4th 606, 614; *Abdallah v. United Savings Bank*, *supra*, 43 Cal.App.4th 1101, 1110; 5 Witkin, Summary of Cal. Law, *supra,* Torts, § 45, p. 111.)

### DISPOSITION

The judgment is affirmed.

_____
Richman, J.

We concur:


_____
Kline, P.J.


_____
Brick, J.[*]

---

[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.